COMMONWEALTH *vs.* DENNIS PORTER.

Suffolk.  September 16, 1981. — December 8, 1981.

Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, & LYNCH, JJ.

*Homicide. Practice, Criminal,* Required finding, Instructions to jury,
Capital case. *Identification. Evidence,* Consciousness of guilt, Cross-
examination.

At the trial of indictments for murder in the first degree, where the jury
could have found that the defendant was the last person seen with the
victims and that his conduct subsequent to the deaths of the victims
showed incriminating knowledge and consciousness of guilt, the evi-
dence, as seen in the light most favorable to the Commonwealth, was
sufficient to warrant submission of the cases to the jury.  [651-654]
At the trial of indictments for murder in the first degree, the judge's in-
structions to the jury on the issue of consciousness of guilt created no
substantial risk of a miscarriage of justice.  [654-656]
Where a witness, after being shown a group of photographs, was shown
an additional photograph which an investigator took from his pocket
and, from that photograph, identified a criminal defendant as the in-
dividual he saw near the apartment of two other Commonwealth
witnesses immediately prior to the fire there, the showing of the single
photograph was a continuation of an ongoing process and thus not im-
permissibly suggestive, and the question of the reliability of the iden-
tification was properly left to the jury.  [656-658]
At the trial of indictments, cross-examination of a Commonwealth wit-
ness as to her knowledge of serious criminal charges pending against a
male Commonwealth witness with whom she lived was not unduly re-
stricted, where the evidence sought to be elicited was merely cumula-
tive.  [658]

INDICTMENTS found and returned in the Superior Court
Department on October 15, 1979.

The cases were tried before *O'Connor,* J.

*Kimberly Homan* for the defendant.

*Peter Grabler,* Legal Assistant to the District Attorney
(*Michael J. Traft,* Assistant District Attorney, with him) for
the Commonwealth.

LIACOS, J.  The defendant was tried in 1980 on two indictments for murder in the first degree of Christine Ricketts and Andrea Foye.  A Suffolk County jury convicted Porter of murder in the first degree on both indictments.  The defendant claims error and appeals.  Specifically, the defendant appeals the denial of his motion for a required finding of not guilty, made at the close of the Commonwealth's case.  In addition he challenges portions of the trial judge's instructions to the jury and two evidentiary rulings.  We affirm the convictions.  We conclude further that there is no reason to exercise our power under G. L. c. 278, § 33E, to order a new trial or to direct the entry of a verdict of a lesser degree of guilt.

We summarize the evidence.  Late in the morning of Monday, January 29, 1979, Boston police detectives, responding to a radio call, discovered the bodies of Christine Ricketts, age fifteen, and Andrea Foye, age seventeen, lying together on a sidewalk on East Lenox Street near the corner of Harrison Avenue, Boston.  Ricketts's body was inside a large blue duffel bag, and Foye's body was found in a green plastic trash bag covered by a multicolored bedspread or furniture throw.[1]  The medical examiner determined that the two girls had been strangled and set the time of death in the morning or afternoon of the previous day, Sunday, January 28.  He also noted that Foye had sustained injuries to her mouth, consistent with having been hit with a fist.

Both girls had known the defendant for approximately six months prior to their deaths.  The defendant was Ricketts's boyfriend and had lived with her, first at the Milner Hotel (where Foye also rented a room) and later at an apartment at No. 1 Cortes Street.  The defendant had been with Ricketts intermittently throughout the evening of Saturday, January 27, and more constantly in the early morning hours of Sunday, January 28.  They had left the Cortes Street apartment together at 3:30 A.M. and went to a disco in the "com-

---

[1] There was evidence that the bags had been at that location at least since 10 P.M. of the previous evening.

bat zone." There they met Foye and Robert Harvel, who was a "very good" friend of Porter. Two key witnesses, Joseph Kevin Divens and Patricia Sligh, testified that they observed Porter and Foye arguing in the disco, and that Foye was upset. The four stayed at the disco until 6:30 A.M. and separated upon leaving. Harvel went to the subway. The two girls crossed the street, saying they were going to have breakfast, and Porter initially headed in the opposite direction. At some point shortly thereafter Porter rejoined the two girls, and the three took a cab to the Cortes Street apartment.[2] At trial Porter testified that Ricketts changed her boots at the apartment and the two girls went to get breakfast, while he fell asleep.[3] No other witness testified to seeing either of the two girls alive after this time Sunday morning.

Porter testified that he awoke at 11 A.M. Sunday and began a search for Ricketts which involved his friend Harvel at times and lasted until the late afternoon of the following day. His search had intensified Monday, to the point where he and Harvel had communicated with the Boston Municipal Court and the police by the end of the morning to ascertain if either had knowledge of her whereabouts.

Some time Monday afternoon Porter and Harvel met Sandra Spencer in the "combat zone" and induced her to join them and to lend her car for the search. The three set out for Boston City Hospital. Spencer testified that Porter told her he was looking for "[t]wo dead girls," and that during

---

[2] The Commonwealth presented evidence that prior to trial Porter had given police investigators several different versions of his travels from the point when the four left the disco. Initially he had told them that he had left the girls near the club and had gone directly to his sister's house, where he stayed until 4 P.M. Sunday. Only after he was aware that the cab driver who drove him and the girls to Cortes Street had been found did he adopt the version of events he later testified to. This same pattern of false statements was exhibited by the defendant in regard to initial questions about his relationship to Foye and his place of residence.

[3] The medical examiner testified that the stomachs of both girls were empty of food, indicating that neither had eaten for approximately six hours prior to their deaths. In addition, both girls were found shoeless.

the ride to the hospital he stated unequivocally that "his girls" were dead. After being informed that the girls had not been brought to the emergency ward of the hospital, the trio went to the Southern Mortuary, located nearby.[4] Harvel testified they went to the morgue because someone at the hospital told them two unidentified bodies had been brought to the morgue.

Frank Graca, the mortuary supervisor, was on duty when they arrived. He testified that Porter asked to see "the remains of the two females . . . found in the sack on Harrison Avenue." Graca refused. Graca told them only that two unidentified black girls had been brought in. The defendant and Harvel testified that Graca had provided them with a description of the two girls and told them one had been identified as "Terry Porter."[5] Porter was visibly upset and left with Harvel and Spencer a short while later.

The three went to the home of Porter's sister, Cheryl Bourne, and Porter and Harvel later claimed to have heard a news report there stating that the girls had been strangled, perhaps mutilated, and stuffed in bags.

Porter and Harvel left Spencer at Bourne's house and went to the apartment of Denise Glenn, who was the mother of two of Porter's children. Glenn testified that Porter told her that Ricketts was dead and that he knew because of the description given him by the morgue attendant (a statement apparently false). Porter and Harvel next went to the apartment of Joseph Kevin Divens and Patricia Sligh. Two or three days prior to her death, Divens had slapped Ricketts during an argument. Porter confronted him at the apartment and demanded to know where Ricketts was and why Divens had hit her. A brief altercation ensued which ended with Porter fleeing the apartment on foot with Divens in pursuit.

Divens testified that when the two finally stopped and made peace, Porter told him that "[m]y bitches are dead."

---

[4] Porter omitted mention of Sandra Spencer from his narrative of these events to investigating officers.

[5] Ricketts had sometimes used the name "Terry Porter."

According to Divens, Porter described to him the injuries to Foye's mouth. Porter accounted for this knowledge by the fact that he had just come from viewing the bodies at the morgue.[6]

Police investigation of Porter and his various residences led them to the Milner Hotel, where they interviewed Ruby Murray, a chambermaid. She linked the defendant with the blue duffel bag.[7] Porter denied any knowledge of the bedspread or duffel bag. In February, 1980, while he was incarcerated in the Charles Street jail awaiting trial, Porter met Divens, who was also being held there. As a result of this meeting, Divens wrote a statement repudiating testimony, damaging to Porter, that he had given before a grand jury. At trial Divens claimed he had done so in response to threats by Porter. According to Divens, Porter had told him that a fire at his apartment a year earlier was intended as a warning to him and Sligh not to testify.[8]

1. *Motion for required finding of not guilty at the close of the Commonwealth's case.* For the purposes of this motion we consider only the evidence introduced by the close of the Commonwealth's case. *Commonwealth* v. *Wilborne*, 382 Mass. 241, 244 (1981). *Commonwealth* v. *Borans*, 379 Mass. 117, 134 (1979). *Commonwealth* v. *Kelley*, 370

---

[6] The testimony of both Divens and Sligh was critical to the prosecution. In addition to his testimony concerning Porter's knowledge of the girls' deaths and of Foye's injuries, Divens also identified the bedspread as belonging to the defendant. Sligh corroborated Divens's testimony about the bedspread, and also identified the blue duffel bag as Porter's. Divens and Sligh were lovers, had had a child, and intended to marry. This was elicited from Sligh on cross-examination, but the trial judge did not allow defense counsel to examine her concerning her knowledge of serious criminal charges pending against Divens. Divens was later questioned about these indictments.

[7] James Mills, a private investigator retained by the defendant's counsel, testified that he obtained a statement from Murray wherein she expressed doubt as to her identification of the bag.

[8] To bolster Divens's testimony as to the fire, the Commonwealth introduced, over objection, testimony by Reginald Gatlin, a resident of Divens's building. He identified Porter as one of two men seen lounging near the building shortly before the outbreak of the fire.

Mass. 147, 150 (1976). For the defendant to prevail, we must be convinced that, viewing the evidence "in the light most favorable to the prosecution, [no] rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Commonwealth* v. *Latimore*, 378 Mass. 671, 677 (1979), quoting from *Jackson* v. *Virginia*, 443 U.S. 307, 319 (1979).

With the evidence thus filtered, we think there was no error in submitting this case to the jury, which could have found the following: The defendant was the last person seen with the victims in the morning of Sunday, January 28, after he had taken a cab with them from the disco to the apartment on Cortes Street. The body of one of the two girls was found in a blue duffel bag belonging to the defendant, and the other was covered by a bedspread owned by him. In the afternoon of the day the bodies were found, but before the news of the discovery was broadcast, the defendant, accompanied by his friend Robert Harvel and by Sandra Spencer, rode in Spencer's car to Boston City Hospital to look for "[t]wo dead girls." Shortly thereafter the defendant, Harvel, and Spencer went to the morgue, where the defendant asked permission to view the remains of "the two females . . . found in the sack on Harrison Avenue."[9] Later Porter informed Denise Glenn that, based on a description given to him by the mortuary supervisor, he knew that Ricketts was dead. He told Divens that he had seen the bodies and went so far as to describe injuries to Andrea Foye's mouth. Such information was in his possession at times when it had not yet been made known to the public. The jury could have believed that this was knowledge which only the killer would have. See *Elwell* v. *Athol*, 325 Mass. 41, 44 (1949) (request for report of accident indicating knowledge of its occurrence). See also 2 J. Wigmore, Evidence § 266, at 97-98 & n.2 (Chadbourn rev. 1979), citing contemporary court papers and other materials relating to

---

[9] The bodies had been found on East Lenox Street near the corner of Harrison Avenue.

Commonwealth *vs.* John W. Webster (Mass. 1850), as compiled in Bemis Rep. 178 (the defendant had asked whether the whole of the victim's body had been found, indicating knowledge that it had been dismembered).

Moreover, the evidence was susceptible of a finding that Porter embarked on a series of actions consciously designed to deflect attention from himself by feigning a search for the two girls. Added to this is the evidence of the various falsehoods told to police concerning, among other things, his addresses, his relationship to Foye, and his whereabouts at the time of death. In each instance the story told initially was less incriminating than the truth. Such intentionally false and misleading statements by the defendant could have been found to indicate a consciousness of guilt on his part. *Commonwealth* v. *Montecalvo*, 367 Mass. 46, 52 (1975), and cases cited. *Commonwealth* v. *Bonomi*, 335 Mass. 327, 346-348 (1957). By the same token, the jury were free to believe that Porter made threats against a key witness for the prosecution, again demonstrating a consciousness of guilt. *Commonwealth* v. *Leo*, 379 Mass. 34, 40-42 (1979). *Commonwealth* v. *Montecalvo, supra. Commonwealth* v. *Smith*, 162 Mass. 508, 509-510 (1895).

Because the defendant challenges a portion of the trial judge's instructions concerning consciousness of guilt, see *infra*, we note at this juncture that much of the Commonwealth's case turned on Porter's conduct subsequent to the deaths of the two girls. The evidence of such conduct which is incriminating falls into two categories — that which shows incriminating knowledge and that which shows consciousness of guilt. While proof of mere consciousness of guilt alone may be insufficient to convict of crime, see *Commonwealth* v. *Montecalvo, supra*, evidence of such a state of mind when coupled with other probable inferences, may be sufficient to amass the quantum of proof necessary to prove guilt. See *Commonwealth* v. *Best*, 381 Mass. 472, 483 (1980).

In this case the inferences, though not compelled, are hardly speculative, seen in the light most favorable to the

Commonwealth. See *Commonwealth* v. *Gallison*, 383 Mass. 659, 666 (1981); *Commonwealth* v. *Earltop*, 372 Mass. 199, 200 (1977). Although conflicting inferences could have been drawn from much of the defendant's words and conduct, the determination of where the truth lay was the province of the jury. See *Commonwealth* v. *Amazeen*, 375 Mass. 73, 81 (1978); *Commonwealth* v. *Bonomi, supra* at 355-356.

The circumstantial nature of the evidence against the defendant "does not suggest that [it] was insufficient" to send to the jury. *Commonwealth* v. *Best, supra*. The probative value of such evidence has long been recognized. *Commonwealth* v. *Montecalvo, supra* at 54. It is also clear that circumstantial evidence may reach the qualitative level of proof required by *Latimore, supra*. There was no error in the denial of the defendant's motion for a required finding of not guilty.

2. *Jury instructions on consciousness of guilt.* The trial judge instructed the jury on consciousness of guilt at the end of his charge.[10] Porter alleges error in this portion of the

---

[10] The judge discussed the subject as follows: "I have in mind evidence which you may consider on the question of whether the defendant displayed a so-called consciousness of guilt. Here again I don't refer to this particular evidence to give it any particular emphasis or because I think it is or is not important, but there was this type of evidence presented in this case and you should know something about it in a general way.

"The jury may or may not find the defendant displayed some consciousness of guilt. That's up to you. Such a finding, if made, must be made by a process of inference from another fact or other facts that the jury find. Was there some conduct on the part of this defendant or were there some statements made by him which displayed a guilty conscience, awareness on his part that he had committed the wrong or the wrongs for which he is now being tried? Did the defendant conduct himself in a way that was inconsistent with his innocence of these crimes? Did he say things which were inconsistent with a clear conscience about the deaths of Andrea Foye and Christine Ricketts? Any inference of consciousness of guilt should be drawn with great care, but if the evidence in this case satisfies you beyond a reasonable doubt that the defendant was conscious of his guilt, that is a permissible finding.

"Please understand that when I say it is a permissible finding, I am not suggesting it is a finding that ought to be made or that I would make or

charge and identifies as its main defect "its undue and prejudicially broad scope." The defendant contends that the judge was required to circumscribe carefully for the jury the particular evidence which they could consider as indicating consciousness of guilt.

In addition, he argues that the charge "erroneously placed upon the jury the duty to determine whether the defendant's conduct was consistent with either guilt or innocence." Although he cites no authority for the proposition, he contends that the instructions should properly have allowed the jury an alternative, specifically the possibility of determining that the evidence was too "equivocal to assign to either the guilt or innocence column." Finally, he argues that the charge allowed the jury "to transform prior inconsistent statements into substantive evidence of guilt."

The defendant's objection at trial to this portion of the charge was based solely on an entirely different theory.[11] The issue the defendant now seeks to raise was not properly raised before the judge. See Mass. R. Crim. P. 24(b), 378 Mass. 895 (1979). Since these present claims are raised for

---

that I wouldn't make. I am just saying that's a finding that you may make if you decide you ought to make it on the basis of the evidence.

"In considering the question of consciousness of guilt, you may consider whether the defendant's conduct was only a result of fear that he would not be believed or that he would be erroneously charged with crimes he didn't commit. You may consider whether conduct of this defendant after the deaths of Andrea Foye and Christine Ricketts displayed his innocence of the crimes with which he is charged. So it is for you to determine upon the evidence whether this defendant was conscious of guilt of a crime with which he is now charged, or whether his conduct was indicative of innocence or at least consistent with innocence. If you are satisfied beyond a reasonable doubt that the defendant's conduct or statements demonstrated consciousness of guilt, you may consider that along with all the other evidence in this case on the question of the defendant's guilt of the crimes with which he is charged."

[11] Trial counsel's objection was made "[f]or fear that the jury might in view of those instructions pre-suppose that if they find a consciousness of guilt that of necessity must mean they had found guilt, [therefore] I would ask [for an instruction] that consciousness of guilt on the part of the defendant standing alone would not be sufficient by itself to convict." This concern was adequately met by the instructions.

the first time on appeal, our review is limited to the standard of G. L. c. 278, § 33E, the question being whether the charge as given created a substantial risk of a miscarriage of justice. *Commonwealth* v. *Richmond*, 379 Mass. 557, 562 (1980).

Viewing the instructions "in their entirety, to determine the 'probable impact, appraised realistically . . . upon the jury's factfinding function,'" *Commonwealth* v. *Richards*, *ante* 396, 399-400 (1981), quoting from *United States* v. *Wharton*, 433 F.2d 451, 457 (D.C. Cir. 1970), we find that no such risk was created.

Our reading of the charge as a whole convinces us that the instructions were fair and well-balanced and properly defined for the jury those circumstances in which an inference of consciousness of guilt was justified.[12] Also, there is no merit to the defendant's argument concerning prior inconsistent statements, since the judge properly instructed the jury on this subject throughout the trial and in his charge.

3. *Photographic identification.* Porter's final two assignments of error concern two evidentiary rulings. The first challenges the admission of testimony by one Reginald Gatlin. Gatlin identified the defendant as one of two men he saw near the apartment building occupied by two of the Commonwealth's witnesses, Divens and Sligh, immediately prior to a fire there more than a year before trial.[13] Gatlin made an in-court identification of Porter, but the bulk of his testimony concerned a photographic identification made

---

[12] While the judge could have specifically identified that evidence bearing on consciousness of guilt, we have little doubt that, had he done so, the defendant would now be before us on an entirely different claim of prejudice, namely, that the judge unduly emphasized certain evidence. See G. L. c. 231, § 81. To the extent the defendant argues the judge should have identified the facts constituting consciousness of guilt (e.g., false statements as to his address, false characterization of his relationship with the victim Foye, threats to the witness Divens), he appears to confuse the examples of the rule of admissibility with the rule itself. See *Commonwealth* v. *Montecalvo*, 367 Mass. 46, 51-52 (1975).

[13] See note 8, *supra*.

two weeks prior to trial. The witness testified that he had a very limited opportunity to observe the persons at the apartment building. Furthermore, he had not discussed the incident with anyone until almost a year after the fire. About two weeks prior to the trial he was approached by two investigators. When he was unable to identify the defendant's photograph from among a group shown him,[14] one of the investigators produced a single photograph of Porter from his pocket, saying, "Well, let me let you take a look at this one. Does that one look familiar?" The witness identified Porter from this photograph. He denied that he did so at the officer's suggestion. The judge denied a motion at trial to strike Gatlin's testimony.[15]

In his instructions the judge drew the jurors' attention to this matter and cautioned them that if they found the fact of Porter's presence at the apartment near the time of the fire to be material, the Commonwealth must prove it beyond a reasonable doubt.

Gatlin's testimony was directed at bolstering Divens's testimony concerning Porter's threats. This was a collateral issue in which the trial judge has broad discretion regarding the admissibility of evidence. See *Commonwealth* v. *Pettijohn*, 373 Mass. 26, 30 (1977).

Moreover, from our reading of the record we infer a finding by the judge, albeit not one made in the course of a suppression hearing, that the identification procedure was not suggestive. See *Commonwealth* v. *Clark*, 378 Mass. 392, 399-401 (1979) (fact that attention of witness drawn to photograph dissimilar to others not impermissibly suggestive). Considering the identification procedure in its entirety, the showing of one more photograph was a con-

---

[14] Apparently the photograph of Porter in this array was not a recent one.

[15] This question did not arise pursuant to a pretrial motion to suppress under Rule 61 of the Superior Court, as amended (1980), because defense counsel was not then aware that a photographic identification had taken place. The prosecutor also expressed surprise at the manner in which the identification had been made.

tinuation of an ongoing process. See *Commonwealth* v.
*Venios*, 378 Mass. 24, 29 (1979); and a ruling that it was not
unduly suggestive does not constitute error. The judge was
correct, in light of this ruling on these facts, in leaving the
question of the reliability of Gatlin's identification to the
jury. Any weaknesses in the identification process were not
of constitutional dimension and were thus properly left to
the jury. *Commonwealth* v. *Jones*, 375 Mass. 349, 355
(1978), and cases cited. See *Commonwealth* v. *Dietrich*,
381 Mass. 458, 464 (1980); *Commonwealth* v. *Funderberg*,
374 Mass. 577, 581-582 (1978).

4. *Restriction of cross-examination of Patricia Sligh.*
There is no merit to the defendant's contention that the
restriction on cross-examination of Sligh was error.[16] Sligh's
potential for bias in favor of Divens was clearly established.
Later the pendency of indictments against Divens was shown
by his testimony. The judge did not impermissibly restrict
the cross-examination of Sligh. The evidence of bias sought
to be elicited is merely cumulative. *Commonwealth* v.
*Walker*, 370 Mass. 548, 571-572 & n.16, cert. denied, 429
U.S. 943 (1976). See *Commonwealth* v. *Wilson*, 381 Mass.
90, 116-118 (1980); *Commonwealth* v. *Franklin*, 376 Mass.
885, 903-905 (1978). This was not a case where the penden-
cy of indictments against the testifying witness was sought to
be shown to raise the issue of the bias of that witness. Cf.
*Commonwealth* v. *Joyce*, 382 Mass. 222, 228-232 (1981);
*Commonwealth* v. *Lewis*, 12 Mass. App. Ct. 562, 569-573
(1981).

5. *Section 33E review.* We have reviewed the entire rec-
ord and transcript of the trial, including the remainder of
the charge to the jury, and find no ground for granting
relief pursuant to our power under G. L. c. 278, § 33E.

*Judgments affirmed.*

---

[16] The facts underlying this contention are set forth in note 6, *supra*.