## COMMONWEALTH *vs.* STEVEN J. SCANLON.

Plymouth. January 7, 1992. - May 15, 1992.

Present: LIACOS, C.J., WILKINS, ABRAMS. LYNCH. O'CONNOR, & GREANEY, JJ.

*Indecent Assault and Battery. Evidence,* Fresh complaint, Relevancy and
materiality, Corroborative evidence, Impeachment of credibility, Con-
sciousness of guilt. *Practice, Criminal,* Instructions to jury, Reasonable
doubt, New trial. *Witness,* Corroboration, Credibility.

At the trial of indictments for indecent assault and battery on a person
over the age of fourteen, the fresh complaint testimony of one witness
was merely cumulative of the complainant's testimony and the fresh
complaint testimony of a second witness, while including references to
potentially prejudicial details that the complainant had not included in
her own testimony, was not prejudicial where the fresh complaint testi-
mony did not relate to elements of the offenses of which the defendant
was convicted, nor did it add material evidence to the complainant's
testimony. [669-672]

At the trial of indictments for indecent assault and battery on a person
over the age of fourteen, there was no error in the judge's exclusion of
evidence that the complainant declined to speak with a clergyman alone
several months before she reported the sexual assaults. [672-673]

At a trial for sexual assaults, the judge's final instructions to the jury on
the issue of fresh complaint were sufficient to remind the jurors of the
limited purposes of such evidence in light of the judge's previous expla-
nations on three occasions during the trial regarding the use of fresh
complaint testimony. [673-675]

At the trial of indictments charging sexual offenses, the judge correctly
excluded proffered evidence of an alleged false prior accusation of sex-
ual assault by the complainant, where there was no evidence that the
prior accusation, if made, was false. [675-676]

At a criminal trial, evidence of the defendant's conduct from which an
inference could be drawn that he threatened or intimidated a witness
was properly admitted to demonstrate consciousness of guilt. [676-677]

At the trial of indictments there was no error in the judge's instructions on
reasonable doubt. [677-678]

At a criminal trial, there was no substantial risk of a miscarriage of justice
created by the judge's giving the jury a so-called *Tuey-Rodriquez*

charge when the jury reported it was deadlocked after ten hours of deliberation. [678-679]

In a criminal case the judge properly denied the defendant's motions for a new trial where the "newly discovered evidence" was not in fact newly discovered or was merely cumulative of the defendant's version of an incident collateral to the incidents for which the defendant was convicted; moreover, the defendant's claim that the judge was biased in deciding the motions was without basis. [679-681]

INDICTMENT found and returned in the Superior Court Department on July 25, 1989.

The case was tried before *Cortland A. Mathers*, J., and motions for a new trial were considered by him.

The Supreme Judicial Court granted a request for direct appellate review.

*Jonathan Shapiro* for the defendant.

*Mary O'Sullivan Smith*, Assistant District attorney, for the Commonwealth.

LIACOS, C.J. We are asked in this case to abandon the evidentiary rule that permits the Commonwealth, in a prosecution for sexual assault, to present evidence of the complainant's fresh complaint. In *Commonwealth* v. *Licata, ante* 654 (1992), we considered fully the arguments for and against the fresh complaint rule and concluded that we shall adhere to the rule as it exists in this Commonwealth.[1] Accordingly,

---

[1] In this case, the defendant has argued that the fresh complaint rule is based on outdated views of "female psychology". In *Commonwealth* v. *Licata, ante* 654 (1992), we considered fully the rationale underlying the fresh complaint rule. In *Licata* we expressly disavowed the idea that a sexual assault victim naturally will complain of such an attack promptly. We concluded, however, that the need for the rule persists in order to avert unwarranted juror skepticism that the absence of evidence of a complaint somehow suggests that no assault occurred. We need only further add that the rule does not reflect any view of "female psychology," as the rule applies in cases involving both male and female sexual assault victims.

As to the defendant's argument that the fresh complaint rule is contrary to traditional hearsay rules, we reiterate that fresh complaint testimony is admitted for corroborative purposes only and does not constitute substantive evidence. Thus, the defendant's arguments on this theory miss the mark.

in this case we address only the defendant's additional arguments relating to his trial.

In July, 1989, a Plymouth County grand jury returned two indictments charging the defendant, Steven J. Scanlon, with one count of rape of a child by the use of force, G. L. c. 265, § 22A, and two counts of indecent assault and battery on a person over the age of fourteen, G. L. c. 265, § 13H. Following a trial in the Superior Court Department, the jury found the defendant guilty on both counts of indecent assault and battery and not guilty of the charge of rape. Subsequently, the defendant filed two separate motions for a new trial on the basis of newly discovered evidence. The trial judge denied both motions without a hearing. The defendant then filed a consolidated appeal of his convictions and the denials of his motions for a new trial. We granted the defendant's petition for direct appellate review, and we affirm.

On appeal, the defendant challenges: (1) the scope of the testimony of two fresh complaint witnesses; (2) the exclusion of evidence that the complainant had an opportunity to report the assaults earlier than she did; (3) the trial judge's instructions regarding fresh complaint testimony; (4) the exclusion of evidence that the victim previously had made an allegedly false accusation of sexual assault; (5) the admission of evidence of consciousness of guilt; (6) the charge on reasonable doubt; (7) the judge's use of the so-called *Tuey-Rodriquez* charge; and (8) the judge's refusal to grant the defendant a new trial in light of newly discovered evidence.

We summarize the evidence presented to the jury.[2] The complainant, whom we shall refer to as Kate (not her real name), was fourteen years of age when, in November, 1987, her mother was admitted to Charles River Hospital in Wellesley for psychiatric treatment. Kate, along with her four younger siblings,[3] was left in the care of the defendant,

---

[2]We shall summarize additional evidence as it relates to the defendant's respective claims of error.

[3]Kate's mother had three children, including Kate, from her first marriage and two children from her marriage to the defendant.

Kate's stepfather, in the family's Marion home. Kate's mother remained hospitalized until March, 1988, and, according to Kate's testimony, it was during this period that the defendant sexually assaulted Kate on three occasions.

Kate testified that the first incident occurred in early December, 1987. Kate was watching television in a downstairs bedroom at approximately 9 P.M. when the defendant called for her to come upstairs. Kate's brothers and sisters were sleeping at the time. Kate went upstairs and found the defendant in his bedroom. Kate went into the bedroom and sat on the edge of the bed. She and the defendant had a "regular conversation" until the defendant placed his hand on Kate's shoulder. The defendant then moved his hand down over the front of Kate's shirt and moved his hand around her breast "for about twenty to thirty seconds." Kate then left the room. She testified that she didn't tell anyone about the incident because she wasn't sure if it was a mistake or if she was judging it wrong.

Kate testified that a second incident occurred approximately two weeks later. Kate was downstairs watching television at approximately 9 P.M. when the defendant again called for her. The other children were sleeping. Kate hesitantly went upstairs to the defendant's bedroom. The defendant was in his bathrobe and a candle was burning on the nightstand. When Kate entered the room, the defendant closed the door and told Kate to take off her pants. Kate complied, and sat on the end of the bed, pulling her sweatshirt down over her knees. The defendant approached her, pushed his bathrobe behind him, pushed Kate's ankles up so that her knees were in the air, and began to have intercourse with her. Kate was crying and was asking the defendant "in a small voice" to please stop. After approximately five minutes the defendant did stop and Kate felt a wetness on her thigh. Kate told the defendant that she was going to tell her mother. The defendant responded that her mother wouldn't believe her. He also threatened to harm the family if she told anyone.

Kate testified that a third incident occurred in early February, 1988. Kate was watching television in the late after-

noon and the other children were outside. The defendant called Kate upstairs. Kate was "very hesitant" to go upstairs but she did so because the defendant had called her and because her relationship with the defendant in the previous month had been "pretty normal." When Kate entered the defendant's bedroom he was wearing a bathrobe. He immediately told her to take off her pants. Kate started to cry but did as she was told. After Kate sat on the bed, the defendant pushed back his bathrobe and got on top of her. Kate testified that "this time there wasn't really intercourse" but that the defendant rubbed his penis on her vagina. The defendant stopped after approximately "five to nine minutes" and Kate noticed a wetness on her upper thigh area. Kate told the defendant she "seriously [was] going to tell [her] mother." The defendant responded "in a laughing voice" that her mother would never believe her. The defendant also told her that if she told anyone all her privileges would be taken away.

Kate did not report that her stepfather had assaulted her until September, 1988, when she wrote a note to a friend, Elizabeth Briggs, indicating that "something bad" had happened to her and that if she told anyone "something bad" would happen to her family. Approximately one week later, Elizabeth asked Kate about the note. At first, Kate did not respond. She then told Elizabeth "my stepfather raped me." Elizabeth testified that Kate was "hysterical" and was "crying and punching the wall and kitchen table." Elizabeth urged Kate to report the assaults but Kate refused to do so because she was frightened that something would happen to her family and because she was concerned about her mother's mental condition.

Two weeks later, in the early morning of October 18, 1988, Kate arrived at Elizabeth's house upset and crying. After speaking with Kate, Elizabeth called the Marion police. A police officer came to the house and brought the two girls to the police station. At the station, Kate described the three sexual assaults to Sergeant James Nolan of the Marion police department. Subsequently, Sergeant Nolan called the defendant to the police station and, after advising the de-

fendant of his Miranda rights, informed the defendant about the nature of the allegations. Sergeant Nolan testified that the defendant responded that "he had a feeling that was what it was about when he was driving down to the station. He thought it might be that. He didn't think she would go that far."

The defendant denied that any of the assaults had occurred. At trial, he testified that his relationship with Kate had always been strained and he presented evidence that, prior to any of the incidents in question, Kate had told one of her friends that she hated the defendant. The defendant testified that he was the disciplinarian of the household and that at the time Kate reported the assaults she had been grounded for dialing a "1-900" telephone number and then lying about it. The defendant also introduced evidence that, on at least one of the dates that Kate had estimated the sexual assaults occurred, Kate had spent the night at the home of one of her friends. Finally, the defendant explained that the reason he had told Sergeant Nolan that he "thought it might be that" when he was confronted with the charges against him was because he had passed his wife on the way to the police station and his wife, who had already been to the station, refused to look at him.

1. *Scope of the fresh complaint testimony.* Elizabeth Briggs and Sergeant Nolan were each permitted to testify as fresh complaint witnesses. Elizabeth testified that Kate had sent her the September, 1988, note indicating that "something bad" had happened to her, that Kate had later explained "my stepfather raped me," and that Kate was crying and hysterical when she made this disclosure. Sergeant Nolan testified as to the details of Kate's complaint. In the course of his testimony, Sergeant Nolan mentioned details that Kate had omitted from her own testimony. Specifically, he testified that Kate had reported that the defendant had held her down by the shoulders during the first incident. In addition, Sergeant Nolan testified that Kate had reported that the defendant yelled at her during the second incident and that he had threatened to "do it to her again" if she ever

told anybody. Finally, Sergeant Nolan testified that Kate had reported that, during the third incident, "there was penetration and it hurt."

The defendant contends that the judge committed reversible error in permitting the testimony of these two witnesses because their testimony exceeded the testimony of the complainant herself and because the testimony involved more than a mere dry recounting of the facts.[4]

This court has never insisted that fresh complaint testimony be sanitized to match exactly the testimony of the complaining witness. Such a rule would undermine the purpose of allowing a witness to testify as to the details of a victim's complaint, which is to let the jurors draw their own conclusions regarding whether the fresh complaint evidence corroborates the victim's testimony. See *Licata, supra* at 658-659; *Commonwealth* v. *Bailey*, 370 Mass. 388, 395 (1976). Moreover, such a rule would deprive defendants of the opportunity to highlight discrepancies between the testimony of the witness and the complainant in order to discredit the complainant's testimony. See *Bailey, supra* at 396. We have, however, cautioned that fresh complaint evidence cannot be used as hearsay to fill gaps in the prosecution's case. *Id.* Thus, where a witness testifies regarding details of an event that the witness has not testified to more generally, we have stated that such testimony is not permissible. See *Commonwealth* v. *Kirouac*, 405 Mass. 557, 565 (1989); *Commonwealth* v. *LeFave*, 407 Mass. 927, 941 (1990) (fact that fresh complaint witness gave detailed testimony regarding incident to which child complainant had testified on more general basis did not render the evidence inadmissible). See also

---

[4]Although he did so at trial, the defendant does not now argue that Kate's report of the incidents was insufficiently fresh. In any event, we note that the trial judge properly exercised his discretion in permitting the witnesses to testify. See *Commonwealth* v. *Amirault*, 404 Mass. 221, 229 (1989); *Commonwealth* v. *Comtois*, 399 Mass. 668, 673 (1987); *Commonwealth* v. *King*, 387 Mass. 464, 473 (1982).

*Commonwealth* v. *Coleman*, 30 Mass. App. Ct. 229, 236 (1991).[5]

In the present case, we perceive no error regarding the scope of Elizabeth Briggs' testimony. Elizabeth did not testify to any details of Kate's complaint other than Kate's statement that "my stepfather raped me." This testimony was cumulative of Kate's own testimony that the defendant forced her to have intercourse during the second incident and was hardly inflammatory in light of the subject matter of the indictments. Elizabeth's additional testimony that Kate was "hysterical" and "punching the wall and the kitchen table" when she told Elizabeth about the assaults was based on Elizabeth's own observation of the complainant's demeanor and thus was not fresh complaint testimony.

We are more troubled by the testimony of Sergeant Nolan. Sergeant Nolan's account of Kate's complaint included references to potentially prejudicial details that Kate had not included in her own testimony. Specifically, the reference to penetration during the third incident exceeded the proper limits of fresh complaint testimony because it created a risk that the jury would rely on that testimony to convict the defendant of rape where there was no probative evidence introduced at trial that a rape occurred during the third incident. See *Commonwealth* v. *Kirouac, supra* at 565. See also *Commonwealth* v. *McDuffie*, 16 Mass. App. Ct. 1016, 1017-1018 (1983) (admission of rape incident report as fresh complaint evidence, although arguably cumulative, was error where prosecution relied on report in closing argument as establishing that rape in fact occurred). Although defense counsel did not object to the testimony or move to have the testimony struck, we agree with the defendant that the testimony was improper.

We do not agree, however, that the improper testimony requires reversal. The defendant was acquitted of the charge of

[5]We have noted that there may be instances where admission of details would operate unjustly, such as in cases where particularly inflammatory details are needlessly repeated. See *Bailey, supra* at 397. In such cases, a judge may limit the fresh complaint testimony in his or her discretion. *Id.*

rape and thus the risk created by the improper testimony never came to fruition. Indeed, it may be that this inconsistency between the complainant's testimony and Sergeant Nolan's testimony, as well as another inconsistency between their testimony regarding the second incident,[6] was what prompted the jury to acquit the defendant on the charge of rape. As to the other details added by Sergeant Nolan, we do not agree that those details were prejudicial to the defendant. Sergeant Nolan's testimony regarding a threat by the defendant after the second incident to "do it to her again" if the complainant told anyone of the assault was no more damaging to the defendant than the victim's own testimony that the defendant had threatened to harm her family if she reported the assault. Similarly, Sergeant Nolan's testimony that the defendant held the complainant down during the first incident was not prejudicial. The testimony of Sergeant Nolan did not relate to an element of the crime of indecent assault and battery, nor did it add material evidence to the complainant's testimony.

2. *The complainant's prior opportunity to report the assaults.* The defendant contends that the trial judge erred in excluding evidence that, in January, 1988, a clergyman who periodically counselled Kate and her family, Reverend Thomas Bergeron, had asked Kate if she wanted to speak with him alone and she declined. The defendant argues that, in light of Kate's own testimony that she liked Reverend Bergeron and that she trusted him, the excluded evidence was relevant to show that Kate had an opportunity to report the sexual assaults prior to the date that she actually did so.

In this case, the transcript reveals that it was clear to the jury that seven months had elapsed between the time of the last assault and Kate's report of the assaults, and that during this time Kate had numerous opportunities to report the assaults to her girlfriends, to her siblings, and others including

---

[6]Although Sergeant Nolan's testimony corroborated Kate's testimony that a rape occurred during the second incident, he did not corroborate Kate's testimony that the defendant had grabbed her ankles during this incident.

Reverend Bergeron. The defendant was allowed on cross-examination of the complainant and other witnesses to make the point. There was no error.

3. *Fresh complaint instructions.* In each instance where the judge permitted the Commonwealth to present fresh complaint testimony, the judge instructed the jury that the evidence was admitted for corroborative purposes only. On the first day of trial, during the complainant's testimony and in anticipation of future "fresh complaint" witnesses, the judge stated that "the jury may consider fresh complaint evidence only to the extent that it corroborates evidence given by the alleged victim, himself or herself. Evidence of a fresh complaint witness cannot stand by itself and establish the factual assertions in evidence." Then, after thoroughly instructing the jury that they should not consider the evidence at all unless they first determined the complaint was "fresh," the judge stated "I will refer to this subject matter, no doubt, again before this case is over on one or two occasions, perhaps; but suffice it now to say that you must pay particular attention to the details that have been testified to by [the complainant] . . . because you're going to have to determine whether or not those events are substantiated or not . . . by the fresh complaint witnesses."

On the second day of trial, prior to Elizabeth Briggs' testimony, the judge once again stated "you may only consider the [fresh complaint] evidence that this witness gives to the extent that it corroborates and/or substantiates testimony of the alleged victim. You cannot establish any fact on this witness or this witness's evidence alone. It will not stand by itself. It will have evidential value only to the extent it is corroborative. I know that's a little heavy, but try to bear it in mind as you listen to this testimony." Subsequently, when the Commonwealth called its next witness, Sergeant Nolan, the judge reiterated that "[t]his again is fresh complaint evidence . . . . Bear in mind the principles I just set forth with you as to the last witness, the same principle applies in this situation."

On the fourth day of trial, in his final charge to the jury, the judge stated that "I again remind you that . . . if you determine the complaint . . . is [a] fresh complaint, you may consider the evidence given by the fresh complaint witnesses only to the extent that it corroborates the testimony of the principal witness, the alleged victim herself." The defendant objected to the judge's charge, and requested that the judge further instruct the jury that the fresh complaint evidence had no independent probative value that the defendant committed the acts complained of or that he committed any acts described in those statements to which the complainant had not testified. The judge declined to give the requested instruction. On appeal, the defendant contends that the judge's jury charge was insufficient to apprise the jury that fresh complaint evidence may not be used for substantive purposes.

We agree with the defendant that the judge's final charge, standing alone, was insufficient to apprise the jury of the limited purposes of the fresh complaint testimony. An instruction that such evidence may be used only to corroborate the complaining witness's testimony, without a definition of the term corroboration, does not alleviate the risk that the jury would use such evidence substantively. However, in light of the judge's previous explanations regarding the use of the fresh complaint testimony, we think the judge's final charge was sufficient to remind the jurors of the limited purposes of such testimony. This case is distinguishable from *Commonwealth* v. *Almon*, 30 Mass. App. Ct. 721 (1991). In *Almon*, the judge never instructed the jury regarding the limited purposes of fresh complaint evidence. Similarly, the defendant's reliance on *Commonwealth* v. *Montanino*, 409 Mass. 500, 511 (1991), is misplaced. In *Montanino*, the instruction complained of was the judge's failure at any time to place before the jury the issue whether the past complaint admitted in evidence was indeed "fresh" before the jury could consider it, as well as failing any time to instruct the jurors of the legal meaning of the term "fresh." *Montanino, supra* at 509-511. On appeal, we stated this to be error, but held that the prior complaint, given four years after the alleged incident, could

not be considered as a fresh complaint. In the case at bar the judge properly instructed the jury on three occasions regarding the use of fresh complaint testimony and he reminded the jury of those instructions on two additional occasions. There was no error.

4. *Evidence of allegedly false prior accusation of sexual assault.* During the course of trial, the defense sought to introduce evidence that Kate had falsely accused her natural father of sexual assault prior to bringing charges against the defendant. The judge excluded the evidence on the basis that the defendant had not presented evidence that the prior accusation, if made, was false. See *Commonwealth* v. *Bohannon*, 376 Mass. 90, 95 (1978). See also *Commonwealth* v. *Sherry*, 386 Mass. 682, 692 (1982). The defendant now argues that his offer of proof was sufficient to establish that the prior accusation was false.

The defendant's offer of proof was not a model of clarity. Under any view of it, there is nothing in the offer to show that the defendant had any objective basis to expect that the prior accusation, if made, was false.[7]

---

[7] The closest the defendant gets to the issue of false accusation is revealed by this excerpt from a lobby conference:

| JUDGE: | "It is my understanding that the defendant has shown through an offer of proof an intention to introduce testimony through a girlfriend of the alleged victim that the alleged victim told the girlfriend that the biological father of the alleged victim had had some sexual contact with her. Is that correct?" |
| DEFENSE COUNSEL: | "She didn't specify it was intercourse but had been molested. 'I don't want to go down there again. He may try the same thing.' Or words to that effect." |
| JUDGE: | "There is no proof or evidence before me as to whether or not that accusation is or is not a false accusation. Or whether there has been any pattern of accusations made by this alleged victim. And on that basis I'm going to exclude the evidence." |
| DEFENSE COUNSEL: | "And would the rights of the defendant be saved, Your Honor?" |
| JUDGE: | "The defendant's rights are saved." |
| DEFENSE COUNSEL: | "And the defendant if allowed would ask [Kate] *if* |

In these circumstances, we cannot say the judge erred in excluding the offered evidence. No evidence was proffered which would create a basis to conclude that any prior accusation was made falsely. A mere hope of recantation is not a justification for a fishing expedition under the guise of the *Bohannon* rule. See *Sherry, supra* at 696. See also *Commonwealth* v. *McDonough*, 400 Mass. 639, 650-651 (1987).

5. *Consciousness of guilt evidence.* During trial the complainant and Elizabeth Briggs were permitted to testify regarding an incident that occurred seven months after the defendant was arrested for the offenses for which he was tried. Kate and Elizabeth each testified that they were walking with Kate's brother and another boy along Route 105 in Marion when the defendant approached them in his automobile and swerved as if to hit them. Kate testified that the defendant's automobile came within inches of hitting her, that she jumped out of the way, and that the defendant turned and smiled at her as he passed. Elizabeth testified that the automobile swerved toward Kate, that Elizabeth pulled Kate onto the sidewalk, and that the defendant gave them a "pretty dirty look." The judge allowed this evidence, over the defendant's objection, as tending to show consciousness of guilt.[8] The defendant contends this ruling was error.

It is well established that evidence regarding threats or intimidation of key witnesses for the prosecution is admissible to demonstrate consciousness of guilt. See *Commonwealth* v. *Porter*, 384 Mass. 647, 653 (1981); *Commonwealth* v. *Leo*, 379 Mass. 34, 40-42 (1979); *Commonwealth* v. *Smith*, 162 Mass. 508, 509-510 (1895); *Commonwealth* v. *Sowell*, 22

---

*in fact that had happened. I think I said this morning the answer would be no.* And I would try to develop it through the other witness."

[8]After the evidence was admitted, the defendant testified to a different version of the incident. He testified that he was driving along Route 105 when he saw a group of children, that he pulled to the left to avoid the children and to avoid a pothole, and that he then was forced to veer back to the right due to an oncoming automobile. The defendant estimated that he stayed two to three feet away from Kate and Elizabeth and that he did not recognize them until he was passing them.

Mass App. Ct. 959, 961 (1986). The defendant contends, however, that such evidence is admissible only where the threat or intimidation is expressly addressed to the witness's testimony, such as where a defendant bribes a witness not to testify or where a defendant threatens harm to the witness in the event that the witness testifies. There is no such rule. If conflicting inferences are to be drawn from a defendant's conduct, the determination of where the truth lies is the province of the jury. See *Commonwealth* v. *Porter, supra* at 654. See also *Commonwealth* v. *Sowell, supra* at 961. In this case, where the judge properly instructed the jury regarding the use of the consciousness of guilt evidence, we conclude there was no error.[9]

6. *Reasonable doubt instruction.* The defendant argues that the trial judge's reasonable doubt instruction operated to reduce the Commonwealth's burden of proof because the judge unduly relied on "negative" definitions of reasonable doubt (i.e., what reasonable doubt is not) without placing equal emphasis on positive definitions of reasonable doubt. This claim is without merit. The "negative" definitions in the judge's charge were counterbalanced by the judge's instruction that the defendant is entitled to the presumption of innocence and by the language in the charge which the defendant concedes follows the "time tested and widely approved" language of *Commonwealth* v. *Webster*, 5 Cush. 295, 320 (1850). See *Commonwealth* v. *Williams*, 378 Mass. 217, 235

---

[9]We also reject the defendant's claim that the judge committed error in his charge to the jury when he stated "you have heard evidence in this case that the defendant swerved his car, or however you recall the evidence, in some degree of proximity to the alleged victim and her friends, and that this episode occurred after she had complained to the police that he had raped her. You have also heard evidence that the course of the vehicle was influenced by a pothole." The defendant alleges error in the judge's failure accurately to recount the defendant's version of the incident, namely, that the course of his vehicle was influenced by an oncoming automobile. There was no error. The judge was not required to "bring to the attention of the jury the defendant's own innocent explanation" for the incident, *Commonwealth* v. *Toney*, 385 Mass. 575, 585 (1982), and moreover the judge properly apprised the jury that their recollection of the evidence was determinative.

(1979). We have upheld repeatedly instructions which incorporate negative definitions of reasonable doubt such as those used in this case where the negative definitions are counterbalanced by instructions following *Webster.* See *Commonwealth* v. *Sheline,* 391 Mass. 279, 295-296 (1984). There was no error.

7. *Judge's use of Tuey-Rodriquez charge.* After approximately ten hours of deliberations over the course of two days, the jury sent the judge a note which read: "we respectfully submit to you that the jury cannot agree on a verdict on any of the three counts. We show no progress since yesterday." The judge recalled the jury and delivered a so-called *Tuey-Rodriquez* charge.[10] The defendant argues that the charge was premature and thereby coerced a verdict.

At the outset, we note that the defendant did not object to the judge's timing of the charge.[11] In the absence of a proper objection, our review is limited to whether the timing of the charge created a substantial risk of a miscarriage of justice. *Commonwealth* v. *Sheline,* 391 Mass. 279, 292 (1984). Even if the defendant's claim were entitled to full review, however, we would conclude that the judge properly exercised his discretion in delivering the charge.

A *Tuey-Rodriquez* charge "is intended to be used when because of the lapse of time or otherwise the judge apprehends that the jury is deadlocked." *Commonwealth* v. *Rodri-*

---

[10]The essence of such a charge is that jurors should not assume that another jury would be better able to decide the case, that those jurors in favor of conviction should ask themselves whether they are truly convinced beyond a reasonable doubt, and that those jurors in favor of acquittal should ask themselves whether their doubts are reasonable. See *Commonwealth* v. *Rodriquez,* 364 Mass. 87, 98 (1973). In this case, the judge's charge essentially followed the charge we set forth in *Commonwealth* v. *Rodriquez, supra* at 101-102, and the defendant makes no objection to the substance of the charge.

[11]Upon the judge's receipt of the jury's note, defense counsel moved for a mistrial. The judge denied the motion for a mistrial and indicated that he was going to deliver the *Tuey-Rodriquez* charge. Defense counsel responded "okay" and indicated his preference that the charge be delivered immediately, before the jury retired for the evening, rather than the following morning.

*quez,* 364 Mass. 87, 98 (1973). See G. L. c. 234, § 34. Although we have cautioned against delivering the charge prematurely, see *Rodriquez, supra* at 100, this risk is most prevalent where a judge recalls the jury on his or her own initiative in order to prompt the jury to reach a decision. In circumstances such as those presented in this case, where the jury themselves notified the judge that they were deadlocked and had not made any progress since the previous day, the risk that the charge was premature was virtually nonexistent.

8. *Motions for a new trial.* Approximately three weeks after the conclusion of the defendant's trial, defense counsel secured an affidavit from one Jeffrey Howell which indicated that Jeffrey was present at the scene when defendant allegedly swerved his automobile at the complainant and which indicated that the defendant did not swerve his automobile as if to hit the complainant.[12] On the basis of this evidence the defendant filed a motion for a new trial. The motion was denied without a hearing. Subsequently, the defendant was acquitted of charges brought by Elizabeth Briggs in a different proceeding in which the defendant had been charged with intimidating a witness. On the basis of this evidence, the defendant filed another motion for a new trial which was denied without a hearing. The defendant contends that the judge erred in denying these new trial motions and that the judge's decision was based on his own belief in the defendant's guilt.

"A defendant seeking a new trial on the ground of newly discovered evidence must establish both that the evidence is newly discovered and that it casts real doubt on the justice of

---

[12]The affiant, a teenage friend of the complainant's brother, stated that the defendant "drove through the intersection in what seemed a normal manner to me. He did not swerve the car toward [Kate] as if he were trying to hit her. [Kate] was standing still as [the defendant] drove by. She had one foot resting on her skate-board. The vehicle passed within about two feet of [Kate] at the closest point. Elizabeth Briggs did not grab [Kate] to pull her out of the way. I was close enough to hear if Elizabeth Briggs had yelled a warning to [Kate], and I heard nothing."

the conviction. . . . The evidence said to be new not only must be material and credible . . . but also must carry a measure of strength in support of the defendant's position. . . . Thus, newly discovered evidence that is cumulative of evidence admitted at the trial tends to carry less weight than new evidence that is different in kind. . . . Moreover, the judge must find there is a substantial risk that the jury would have reached a different conclusion had the evidence been admitted at trial." (Citations omitted.) *Commonwealth* v. *Grace*, 397 Mass. 303, 305-306 (1986).

In this case, the record does not reveal the judge's reasons for denying the new trial motions. We conclude, however, several reasons support the judge's decision. First, the evidence in support of the first new trial motion was not newly discovered. See *Commonwealth* v. *Pires*, 389 Mass. 657 (1983); *Commonwealth* v. *Brown*, 378 Mass. 165, 170 (1979). The defendant was informed two days prior to trial that Jeffrey Howell and the complainant's brother were present when the swerving incident allegedly occurred and that the boys had witnessed the incident. The defendant did not attempt to locate Jeffrey Howell at this time nor did he move for a continuance. Further, given that the defendant himself had admitted swerving the vehicle, an admission that is at odds with Jeffrey's statement that the defendant proceeded through the intersection in a normal manner, the judge properly could have concluded that the evidence was not credible. The grant of a motion for new trial lies within the sound discretion of the trial judge. Mass. R. Crim. P. 30 (b), 378 Mass. 900 (1979). There was no abuse of discretion in the denial of the first motion. See *Commonwealth* v. *Brown*, supra.

Similarly, we also conclude that the trial judge properly exercised his discretion in denying the second motion for a new trial. Although the evidence of the defendant's acquittal on charges of attempting to intimidate a witness was "new," the evidence was essentially cumulative of the defendant's version of the incident. Moreover, as we have noted, although the evidence may have lent credibility to the defendant's ver-

sion of the swerving incident, this incident was collateral to the incidents for which the defendant was convicted.

Finally, we find no basis to conclude, as the defendant contends, that the judge denied the motions for a new trial because of his own belief that the defendant was guilty. See *Commonwealth* v. *Markham*, 10 Mass. App. Ct. 651, 654-655 (1980). The only evidence the defendant offers in support of this argument is a sentencing memorandum written by the judge in which the judge explained his reasons for exceeding the sentencing guidelines in sentencing the defendant. The defendant appealed his sentence to the appellate division, which dismissed the appeal. We reject the defendant's attempt to translate his dissatisfaction with that decision into a finding that the judge was biased in deciding the defendant's motion for a new trial.

*Judgments affirmed.*

*Orders denying motions for new trial affirmed.*