# Commonwealth *vs.* Luis Santiago.

No. 00-P-1528.

Middlesex. February 5, 2002. - May 9, 2002.

Present: Greenberg, Kaplan, & Grasso, JJ.

*Evidence,* Fresh complaint, Corroborative evidence, Credibility of witness, Cross-examination, Bias. *Practice, Criminal,* Instructions to jury. *Witness,* Victim, Corroboration, Credibility, Cross-examination.

At a trial of indictments for rape, assault and battery with a dangerous weapon, and assault and battery, the judge did not err in giving the customary fresh complaint charge to the jury with regard to testimony by police officers reporting what the victim had seen, and in declining the one-sentence charge proposed by the defendant. [660-662]

At a criminal trial, the judge did not err in declining to permit the defendant's cross-examination of the victim about three pending misdemeanor charges (first offenses arising from the same incident) to determine whether "she has a bias to curry favor with the government," or to conduct a voir dire on the matter, where the defendant failed to make a showing of some likelihood that the evidence revealed would somehow be probative of the witness's bias. [662-664]

Indictments found and returned in the Superior Court Department on January 14, 1998.

The cases were tried before *Herman J. Smith, Jr.,* J.

*David M. Skeels,* Committee for Public Counsel Services, for the defendant.

*Esther M. Bixler,* Assistant District Attorney, for the Commonwealth.

Kaplan, J. Tried by jury in Superior Court, the defendant, Luis Santiago, was convicted of two counts of aggravated rape (G. L. c. 265, § 22), assault and battery with a dangerous weapon (a knife) (G. L. c. 265, § 15A), and assault and battery

(G. L. c. 265, § 13A).[1] The defendant appeals, questioning the adequacy of the jury instructions regarding the victim's "fresh complaints," and the propriety of a ruling which limited cross-examination of the victim on her arrest record intended to show her bias or prejudice as a witness. This opinion deals sequentially with the trial record, instructions, and limited cross-examination. We affirm the convictions.

*Commonwealth's case.* Sometime in August, 1997, according to her testimony, Rose Rowe[2] (aged nineteen) and her boyfriend, Jake Kilroy, came to live with the defendant Luis Santiago (aged forty-six) and his adult son, Angel, in a three bedroom apartment at 9 Fort Hill Avenue in Lowell. Rose and Jake occupied one room, Luis and Angel separately the other two. It seems Luis, unemployed but receiving assistance, took care of most of the costs of running the place. In October, Jake left. Luis had shown some fleshly interest in Rose, trying to fondle or touch her when the other household members were absent. On December 13, 1997, a spat developed between Rose and Luis: Rose wanted to go out and Luis held back her keys to the apartment. Police came and departed. Angel had taken the one serviceable telephone and locked it in his room before he went outdoors. Rose broke down the door to get at it. This also led to an appearance of police. Luis went out to acquire and drink liquor, and came back in a mood to raise the radio to a blast and to break articles of furniture in the living room. Rose had returned to her bed. Now she got up to unplug the radio.

When Rose said she was going to leave, Luis, drunk, said, "If I can't have you, no one can. You're not leaving." He seized her by the throat, then by her arm and hair. She feigned needing to go to the bathroom but he did not loose his hold and pulled her there. She said she could not act while he was standing over her, whereupon he threw her against the wall and she fell into the bathtub. He dragged her to the kitchen, seized a kitchen knife, then dragged her to her room. Knife in hand, he told her to take her clothes off; she did so and he did the same. On his

[1]The defendant was acquitted of an additional count of assault and battery with a dangerous weapon (a board); an indictment for attempted murder was dismissed before trial on nol pros.

[2]Pseudonym.

orders, she lay on her stomach on the bed. He pushed his penis into her rectum, then flipped her over and attacked her vaginally until he ejaculated. Meanwhile he roughed her up, leaving marks shown in detail in photos later taken and received in evidence. He had put the knife to her throat, then drawn it under her buttocks, leaving a mark.[3] Finally he left her and went to the bathroom. Rose, hastening into some clothes, went outside to a nearby pay telephone and called the police. It was past 3:30 A.M.

Lowell patrolman Robert Davidson, Jr., responded in a marked cruiser and, as he testified, found Rose at the phone, very distraught, crying, shaking, out of control. He sat her in the cruiser for ten minutes. She spoke briefly about the episode. Davidson recalled Rose referring to the police responses earlier in the day. Later on Luis awakened her. He said he loved her, if he could not have her, no one could, he was going to kill her if he could not have her. He pulled a knife, put it to her throat, told her to undress. He raped her anally and vaginally and ejaculated. She was able to flee the apartment.

EMTs drove Rose to Saints Memorial Medical Center where she was taken in charge by Dr. Searle and registered nurse Mc-Carthy for the preparation of a "rape kit." Nurse McCarthy testified to Rose's appearance and condition as she observed her at the time. Rose was tremulous, weeping, with outward signs of red face, swollen eyelids, and neck marks. Rose said she had been raped by a roommate's father.

Detective Thomas Hultgren of the Lowell police arrived at the hospital shortly to take over the case from Davidson. He testified that he spoke with Rose in the examination room while they awaited the completion of the rape kit.[4] She was a "mess," crying, upset, injured. She said she had been choked, dragged by the hair, had a knife put to her, and was raped both ways. With Rose and the rape kit, Hultgren drove to the police location. There he had a number of pictures taken (referred to

---

[3]When police searched the apartment under warrant, they found a knife, broken at the handle, in the living room. The room was a shambles.

[4]An analyst from the State police crime laboratory, Christine Lemire, testified that blood was found on the knife blade, but in too small a quantity to allow material study. Sperm cells appeared in the vaginal smear.

above) to record Rose's bodily marks. Rose elaborated somewhat on her encounter with Luis. She had been in bed and came out to the living room as Luis, drunk and violent, turned up the music. That was when he grabbed her. He had gotten a knife somewhere along the line. The detective ended the interview because Rose was still distraught. On December 16, Rose returned to give a formal signed statement.

About 10:00 A.M., December 14, Luis, already under arrest, was taken from the lockup, received Miranda warnings and a "safe harbor" statement, see *Commonwealth* v. *Rosario*, 422 Mass. 48, 57 (1996), agreed to answer questions without counsel, and waived prompt arraignment.[5] After mentioning the quarrels that resulted in visits from the police, Luis said in substance there were acts of intercourse with Rose but these were with her consent. When Rose entered the living room to deal with the radio noise, he suggested some sex, and as she demurred because he was drunk, he said a "quickie" would do. In her room they disrobed and he indulged with her in anal and vaginal intercourse, accompanied by kissing and sucking her breasts and vaginal and anal places; thus he accounted for probable "hickies" at some spots. Toward the end of the protracted episode, Rose asked for a drink. When he fetched a drink and returned to the room, she was gone. Luis at first told Hultgren no knife was involved. Hultgren confronted him with the Polaroid picture of Rose's buttocks indicating use of a blade. Luis then said he had used a knife but it was in play. Hultgren prepared a statement and Luis signed. (This statement, and Rose's as well, were read out during Hultgren's testimony.)

*The defense.* Maria Santiago, Luis's daughter, gave brief testimony for the defense. She said in substance that for some short period of time Luis and Rose lived at her place at 9 Garin Terrace, Lowell, in one room as a couple. When Rose misbehaved toward the neighbors, Maria reacted negatively, and it was then that the two moved to the apartment at Fort Hill Avenue.

The son Angel's ragged testimony also suggested Rose and

---

[5]At the defendant's instance, a judge (other than the trial judge) conducted a detailed voir dire on the question whether Luis gave the statement voluntarily and with understanding. She found, with memorandum, in the affirmative.

Luis cohabited before they arrived at the Fort Hill Avenue apartment.

Luis, testifying on his own behalf, claimed Rose was his consenting partner even before the move to the Fort Hill Avenue address. He suggested that Rose returned to her room after he inquired about sex and that she was in bed when he asked her a second time; then she yielded. During the anal penetration, Rose said it hurt, and he withdrew. About the knife, he now denied saying he used it in play while engaging with Rose; he said he did not bring a knife into that room; rather he took up the knife in the kitchen and brought it into the living room where he used it to try to fix the table he had damaged, and in the process broke off the handle.

*Instructions.* With or without the aid of the *Latimore* principle,[6] there is evidence in the case quite sufficient to support the verdicts on which the defendant was convicted; the defendant makes no contention to the contrary. He criticizes, however, the judge's instructions about the "fresh complaint" testimony by Davidson and Hultgren reporting what Rose had said to them.

The defense moved before trial that the judge instruct the jury only as follows: "The only reason the fresh complaint witness is allowed to testify is to show that the complaining witness told someone." Defendant's counsel expressed disagreement with the instruction customarily given (summarized in the margin[7]): he thought talk of "corroboration" actually suggested that "the jury *is* to take fresh complaint witness'[s] testimony for the truth of the matter" (emphasis in defendant's "request for

---

[6]*Commonwealth* v. *Latimore,* 378 Mass. 671, 677 (1979), adopts the statement in *Jackson* v. *Virginia,* 443 U.S. 307, 318-319 (1979): "[The] question [standard on application for a required finding of not guilty] is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original).

[7]Apart from a definition of "freshness," etc., the jury are instructed that the alleged victim's statement may be used only to corroborate her in-court testimony and not as substantive evidence on whether the defendant committed the offense; "corroborate" means to confirm or support the credibility of the victim's testimony; if the fresh complaint evidence is different from, or more extensive than what the victim testified to in court, it may not be used to fill in any gaps in her testimony.

limiting instruction regarding fresh complaint testimony"). The judge indicated he would stay with the customary instruction and give it with each fresh complaint witness, as he went on to do. Later, among the defendant's written requested final jury instructions, the defendant asked the judge to say that if the details of the victim's fresh complaints were consistent with her own testimony at trial, the jury might find this fact supported her credibility; if the details were inconsistent, the jury might find her credibility weakened. Instead, the judge repeated at length the customary fresh complaint instruction along with instructions about inconsistent statements by a witness as bearing on the witness's credibility, and, more generally, about how the jury might assess the credibility of witnesses.

The judge committed no error in declining to give the defendant's proposed one-sentence charge and in giving the customary charge instead. It is established in the Commonwealth that a fresh complaint witness may testify in full detail to the complaint as the victim related it to him; the grounds for preferring to receive the report in detail are well understood. See *Commonwealth* v. *Licata*, 412 Mass. 654, 656-660 (1992). The court's charge is not abrupt but of sufficient length to instruct on the testimony in its extended form. As to the claim that the reference to "corroboration" may lead the jury to take the testimony for the truth of the matter, the instruction warns specifically against this. Regarding consistencies or inconsistencies between the fresh complaint testimony and the victim's in-court testimony as related to the victim's credibility, the defense is at liberty to bring out the inconsistencies; this is, indeed, an intended advantage for the defense deriving from the allowance of fresh complaint testimony to its full extent; such attack by the defense may leave the victim's credibility intact, or render it marginal, or even destroy it. See *Commonwealth* v. *Bailey*, 370 Mass. 388, 396 (1976); *Commonwealth* v. *Scanlon*, 412 Mass. 664, 671-672 (1992); *Commonwealth* v. *Lagacy*, 23 Mass. App. Ct. 622, 630-631 (1987). The defense suggested by its last proposed instruction that the judge should speak to the consistency-inconsistency point. The judge charged much to that effect, when, in addition to the customary charge linking corroboration to credibility, he charged on inconsistent state-

ments and sizing up witnesses' worth — the instructions operating together. See *Commonwealth* v. *Chapman*, 433 Mass. 481, 490 (2001).

In fact, the defense was awake to the possibilities of attack on the corroborating fresh complaint testimony, and pursued them. Counsel pointed to three inconsistencies, as he suggested, between the victim's trial testimony and her earlier statements to one police officer or the other: (i) victim testified Jake Kilroy lived at the Fort Hill Avenue address and moved out but did not mention this fact earlier (victim was cross-examined on the point); (ii) victim testified to being dragged into her bedroom and raped, but earlier stated to an officer the defendant attacked her as she lay in bed (elicited in cross-examination of officer); (iii) victim testified she had been cut or scraped in her buttocks with a knife, but earlier did not say this to the officer (same). Thus the defendant took some benefit out of the fresh complaint material; it happened this did not amount to much. At the same time counsel was trying to persuade the jury, vainly as it turned out, that there was no rape but consensual sex, and that the claim of rape was the victim's means of getting rid of an older man with bad habits.

*Limit on cross-examination.* The defense sought to cross-examine Rose about three misdemeanor charges (first offenses arising from the same incident) then pending in District Court,[8] the questions to be directed to whether "she has a bias to curry favor with the government." According to the misdemeanors' docket entries, Rose had been arrested on May 30, 1999; was released on $150 bail and ordered to appear in court the next day; failed to appear; was picked up on June 9, 1999, ordered to appear the next day, and released. On June 10, an assistant clerk informed the District Court judge that Rose would be testifying in the present rape trial in Superior Court and so couldn't appear in the Ayer court. The judge set a new appearance date of July 9, 1999. Rose in fact took the stand at the rape trial on June 10 and the request to cross-examine her on

---

[8]Possession of marijuana, G. L. c. 94C, § 34, six months or fine up to $500 or both; minor operating vehicle containing alcoholic beverage, G. L. c. 138, § 34C, fine up to $50; disguise (apparently by giving false name) with intent to obstruct execution of law, G. L. c. 268, § 34, one year or fine up to $500.

the misdemeanors arrest was made near the close of her testimony that day. The defense made no offer of proof to support its request, except as above. The trial judge declined to permit the cross-examination or to conduct a voir dire on the matter.

The confrontation right surely extends to reasonable cross-examination to show bias or prejudice on the part of a witness. See *Commonwealth* v. *Ahearn*, 370 Mass. 283, 287 (1976); *Commonwealth* v. *Henson*, 394 Mass. 584, 586 (1985). But to claim the right in a particular case the party needs to make a showing of some likelihood that evidence will be revealed somehow probative of the witness's bias. See *Commonwealth* v. *Haywood*, 377 Mass. 755, 763 (1979); *Commonwealth* v. *Allen*, 29 Mass. App. Ct. 373, 378 (1990); *Commonwealth* v. *DeCoste*, 51 Mass. App. Ct. 691, 693-697 (2001). Here the defense could point to nothing tendentious, and the circumstances themselves cancelled any chance of an evidential yield on the subject of bias. Here was an arrest for minor offenses carrying small punishment where a promise of leniency in exchange for testimony is hard to imagine and was not intimated. The offenses were unrelated to the defendant or the charges being tried. The arrest, moreover, occurred some eighteen months after the witness gave her statements to the officers. There was no material difference between those statements and the witness's testimony at trial, no observable intensification of her story against the defendant — hence no indication of the witness's currying favor with the government. See *Commonwealth* v. *Haywood*, 377 Mass. at 762- 763; *Commonwealth* v. *Purcell*, 423 Mass. 880, 883-884 (1996). (Recall that counsel searched the record without conspicuous success to find variances between the fresh complaints and the in-court testimony.) The Commonwealth took an extra step to extend the record[9] to show that the later sentences on the misdemeanors were merely routine for a first offender.[10] It may be worth adding that to allow the cross-examination would have entailed publication of

[9]The Commonwealth moved to add to the record herein the later docket entries in the misdemeanor cases. The motion, unopposed, is allowed.

[10]Rose pleaded guilty to the charges. The judge found sufficient facts, continued the matter without a finding, sentenced Rose to one year of probation,

the misdemeanors and the arrest to the jury — but "[e]vidence of an arrest is generally not a proper subject for impeachment of a witness." See *Commonwealth* v. *Dixon*, 425 Mass. 223, 228-229 (1997).

Where the basis for allowing the cross-examination was intrinsically so thin, the judge might well also deny voir dire, but if the latter was error, it was certainly harmless. See *Commonwealth* v. *Hamilton*, 426 Mass. 67, 73-74 (1997); *Commonwealth* v. *Carmona*, 428 Mass. 268, 271 (1998).

*Judgments affirmed.*

---

and ordered her to attend drug counseling sessions and to submit to random drug screens. She was also to reimburse her bondsman's attorney's fees.