COMMONWEALTH *vs.* DANIEL MAJOK KACHOUL.

No. 06-P-1374.

Middlesex. April 13, 2007. - June 15, 2007.

Present: KAFKER, DREBEN, & GREEN, JJ.

*Identification. Evidence,* Identification, Relevancy and materiality, Videotape, Fresh complaint.

At the trial of an indictment charging rape, the judge did not abuse her discretion in allowing in evidence a videotape of the victim's lineup identification of the defendant and testimony about the identification, where any prejudicial effect of the evidence was outweighed by its relevance to the credibility of the victim and her capacity to recall the incident, two issues contested at trial. [356-358]

At the trial of indictments charging rape and other related crimes, the judge did not err in declining the defendant's request to instruct expressly that the jury could use fresh complaint evidence to impeach as well as to support the victim's testimony, where the judge also gave standard instructions regarding witness credibility and inconsistent statements, and where the jury, by acquitting the defendant of certain charges that involved inconsistencies with the fresh complaint evidence, appeared to understand that fresh complaint evidence could be so used. [358-359]

INDICTMENTS found and returned in the Superior Court Department on January 14, 2002.

The cases were tried before *Sandra L. Hamlin,* J.

*Brownlow M. Speer,* Committee for Public Counsel Services (*Christopher S. Skinner,* Committee for Public Counsel Services, with him) for the defendant.

*Bethany Stevens,* Assistant District Attorney, for the Commonwealth.

KAFKER, J. The defendant, Daniel Majok Kachoul, was found guilty of one count of digital rape and acquitted of seven other charges, three at one trial and four at a second trial, which is at issue here. On appeal, he challenges the trial judge's admission in evidence of testimony and a videotape of a lineup in which the victim identified the defendant. He claims that the lineup identification evidence was both irrelevant, as he did not dispute

at trial that he had been involved in a bizarre chance encounter with the victim, only that no rape had occurred, and prejudicial, as it portrayed him in a criminal light. He also contends that the trial judge's failure to supplement a standard fresh complaint instruction was error. We affirm.

*Background.* The following is derived from testimony and other evidence produced primarily by the Commonwealth at trial. At 9 P.M. on August 24, 2001, the victim, a twenty year old woman who was five feet, four inches tall, was smoking a cigarette as she walked by an apartment building at 11 Brattle Street in Arlington. The defendant, who was nineteen years old and six feet, seven inches tall, was standing outside the apartment building along with three or four other tall, thin, dark-skinned black men. As the victim approached, the other men went inside the building. The defendant asked for her lighter, which she gave him, and asked her name, which she told him. They conversed. She asked his name, and he said Daniel. She noted his accent and asked where he was from; he told her Sudan. He then asked her for a kiss. She said no and he persisted, telling her she was beautiful. She asked him to return her lighter, but he walked away from her into a parking lot, which was darker than the area they had been in originally. She followed him, and he dangled the lighter in front of her; when she reached for it, he grabbed her hair with one hand and her hand with the other.[1] She tried to "wriggle away" but could not.

The victim testified that he grabbed her breast[2] and then pushed her against the wall,[3] despite her telling him to stop. She testified that he put his hand under her skirt and forced his fingers into her vagina.[4] She screamed, "Stop it," and he pushed her down to a sitting position. He kneeled over her, straddling her legs, and inserted his fingers into her vagina again.[5] She screamed.

Christian Smith, who lived in the first floor apartment at 11

---

[1]The jury acquitted the defendant of an assault and battery charge arising from the defendant's pulling of the victim's hair.

[2]The jury acquitted the defendant of an indecent assault and battery charge arising from the defendant's touching of the victim's breast.

[3]The jury acquitted the defendant of assault and battery by means of a dangerous weapon (a brick wall).

[4]The jury acquitted the defendant of this charge of digital rape.

[5]The jury convicted the defendant of this charge of digital rape.

Brattle Street, heard a woman crying and saying, "Stop that," "Get away from me," and "Don't touch me." He went out into the parking lot, where he saw the defendant kneeling over the victim. The defendant's left arm was pushing the victim against the building, and his right arm was between her legs "moving rapidly back and forth."[6] Smith recognized the defendant as a tenant in a basement apartment in the building. Smith walked over, said, "What the fuck do you think you are doing," and pushed the defendant off the victim. The defendant looked at him and walked "and then sort of ran" toward the back of the building. Smith asked the victim if she had been raped, and she said yes.

Smith then drove the victim to the police station, where she gave a statement that recounted the digital rape when she was sitting against the building, but not the earlier digital rape and other criminal conduct that she testified to at trial. Smith also gave a statement. Later that evening, the police met Smith back in his apartment, and Smith directed them to the defendant's apartment.

After the police knocked three times, one of the defendant's roommates answered the door.[7] The police asked if he was Daniel, and he said no. The same exchange occurred with another roommate who then pointed out the defendant. At the time he was arrested, the defendant was asked, "Did you at any time have any conversation or any encounter with any woman this evening, and he responded, "[N]o, no." This statement does not appear in the police report.

At trial, the defendant testified that he and the victim conversed, and she asked where he lived and if she could go inside. Her expressed desire to go inside made him "nervous" and "scared about her," and she did not look "normal." She asked him to show her where his apartment was, and he led her to the side of the building and pointed to windows in the upper floors. He then told her he was tired, and when he squatted down, she did too. As she was "too close," he stood up, and she grabbed his legs and he fell down. He then tried to push her away with his hands and feet and Christian Smith appeared.

The victim was taken to Mt. Auburn Hospital. The doctor's

---

[6]Whether his hand was moving was disputed.

[7]The defendant's roommates were also apparently from Sudan.

report indicated that she was taking Zoloft and Seroquel, an anti-psychotic drug. A pelvic examination revealed no lacerations, lesions, or evidence of trauma. The physician also testified that this was not unusual for a patient who reports digital penetration.[8]

On November 26, 2001, three months following the incident, the victim identified the defendant in a lineup. The defendant was subsequently indicted for eight offenses, including multiple counts of digital rape. The first trial resulted in verdicts of not guilty on three charges and a mistrial on the remaining five charges. At the second trial, the defendant was found guilty on the count which referred to the defendant "forcefully inserting his finger into the vagina [of the victim] while she was pushed against a wall in a seated position," and not guilty on the four other charges.

1. *The lineup evidence.* The Commonwealth moved in limine to introduce testimony and a videotape of the lineup identification. When the issue was addressed, right before trial commenced, defense counsel objected, stating, "[T]his is not an identification case." He explained that the defendant testified at his previous trial that he was there, and "there will be no claim that it was somebody else." As the issue was not going to be contested, he contended the evidence had no probative value. Rather, counsel argued, it was "prejudicial because it has [the defendant] in a criminal lineup and being selected out as though he were a criminal."

The Commonwealth responded that, "at arraignment, defense counsel's argument . . . was that this was an [identification] case and that the defendant had not been involved with this." Also, the videotape was "a piece of evidence in which [the victim] does identify the defendant in a lineup of individuals that look very similar." Defense counsel, who was not present at the arraignment, stated that "this is the first time I've ever heard that anybody . . . claimed it wasn't him." The judge then allowed the Commonwealth's motion in limine, remarking that when the defendant talked to an officer the night of the arrest, "he denied that he had any encounter with a woman that night."

The seventy-five second videotape was then played twice, first when the victim testified and later when an officer present

---

[8]There was testimony from a defense witness that the defendant had very long fingernails.

at the lineup testified and confirmed the victim's identification of the defendant. The defendant objected to the admission of the videotape evidence.[9]

In determining whether it was error to allow the admission in evidence of the videotape and the accompanying lineup testimony, we begin with the Supreme Judicial Court's admonition that, "[n]otwithstanding any concessions by the defense, it was incumbent on the Commonwealth to prove beyond a reasonable doubt that the defendant was the one who had committed this crime." *Commonwealth* v. *Denis*, 442 Mass. 617, 624 (2004). See *Commonwealth* v. *Pov Hour*, 446 Mass. 35, 40 (2006) ("The fact that the defendant's trial counsel, in his opening statement [which is not evidence], conceded the defendant's involvement in the fight did not render the identification evidence inadmissible").

Although the case evolved, identification was at issue at least when the lineup occurred. The victim and the defendant were strangers. When he was first confronted by the police, the defendant denied any interaction with the woman. Additionally, when the victim first approached the defendant he was accompanied by other tall, thin black men. The same was apparently true when the police came to the apartment. There was also no formal stipulation or concession to identification at trial.

Nevertheless, the victim knew the defendant's first name. Another eyewitness recognized the defendant as a fellow tenant at 11 Brattle Street. Immediately prior to trial, defense counsel confirmed that the defense would not be based on the identity of the person involved in the encounter with the victim, but rather what occurred at the encounter. The defendant therefore contends that this is a case "in which the identification of the defendant as the alleged guilty person had been conceded and the sole purpose of placing the photographs in evidence was to burden the defendant with prejudice." *Commonwealth* v. *Smith*, 29 Mass. App. Ct. 449, 452 (1990).

What was at issue, however, was the credibility of the victim and her capacity to recall the incident. The defendant denied that anything sexual had occurred. He emphasized differences in the

---

[9]The defendant objected to the admission of the lineup evidence prior to trial and during the testimony of the victim, and renewed the objection prior to the second showing of the videotape.

victim's accounts of the encounter. The victim's medications, as the defendant pointed out, included antipsychotic medicine. Her ability to identify the defendant months later in a fair lineup (and there is no contention that the lineup was in any way suggestive or improper) was relevant to establishing the strength of her memory and powers of observation and recollection. Moreover, "[a]n identification made in court frequently has little testimonial value as compared with a prior identification [in a properly conducted lineup]." *Commonwealth* v. *Redmond*, 357 Mass. 333, 341 (1970). We conclude that the lineup evidence was therefore admissible and relevant.

Although probative, the placement of the defendant in a lineup is also prejudicial to the defendant in that it portrays him in a criminal setting, holding a number and turning to the left and right in response to police commands. Unlike mugshots, however, the lineup evidence does not signal that the individual has a history of involvement with the criminal justice system. *Commonwealth* v. *Blaney*, 387 Mass. 628, 637 (1982). See *Commonwealth* v. *Smith*, 29 Mass. App. Ct. at 452. He is in the lineup because of the accusations in this case, not because of prior criminal behavior.

The defendant has not identified any decision, in Massachusetts or elsewhere, in which the admission of evidence of a fair lineup was found to be reversible error because of its prejudicial effect. Instead he analogizes to cases in which defendants were forced to go to trial in prison garb. See *Estelle* v. *Williams*, 425 U.S. 501, 504-505 (1976) (recognizing that "the constant reminder of the accused's condition implicit in such distinctive, identifiable attire may affect a juror's judgment"). However, compelling a defendant to appear in prison garb serves no purpose related to the issues to be decided at trial. In contrast, the lineup identification evidence here does serve some legitimate trial purpose.[10]

Where there is probative value to the lineup evidence, "[t]he weighing of the prejudicial effect and probative value of evidence is within the sound discretion of the trial judge, the exercise of which we will not overturn unless we find palpable

---

[10]We also note that the two seventy-five second showings of the lineup videotape could not deliver a "constant" signal of the defendant's criminality. *Estelle* v. *Williams*, *supra*. The trial took place over eleven days.

error." *Commonwealth* v. *Bonds*, 445 Mass. 821, 831 (2006). In the instant case, we discern no abuse of discretion in the judge's admission of the evidence. Unlike having a defendant appear in court during trial in prison garb, the lineup evidence served legitimate trial purposes by contributing to the evidence required to satisfy the Commonwealth's burden of proof and informing the jury on the capacity of the victim to observe and remember. In terms of potential prejudicial effect, the lineup evidence was also quite different from mugshots, as lineup evidence does not signal prior criminal activity.

2. *Fresh complaint instruction.* The defendant also claims that the trial judge's instruction on fresh complaint was inadequate because it failed to state expressly that the jury could use the fresh complaint evidence to impeach as well as to support the victim's testimony.[11] The defendant requested this elaboration because he was emphasizing inconsistencies between the victim's fresh complaint and her trial testimony and considered the standard instruction that the jury could use fresh complaint evidence only for the purpose of corroboration to be misleading. "Corroborate" was defined to mean "confirm or support." Standard instructions regarding witness credibility and inconsistent statements were also, however, given.

In *Commonwealth* v. *Santiago*, 54 Mass. App. Ct. 656, 661-662 (2002), we rejected the same argument in essentially the same circumstances. "The defense suggested by its last proposed [fresh complaint] instruction that the judge should speak to the consistency-inconsistency point. The judge charged much to that effect, when, in addition to the customary charge linking corroboration to credibility, he charged on inconsistent statements and sizing up witnesses' worth." *Ibid.* The argument in this case is similarly without merit. Furthermore, the jury appeared to understand that the fresh complaint evidence could be used both to support and impeach the victim's testimony, as they acquitted the defendant of charges that involved inconsistencies with the fresh complaint testimony and only convicted

---

[11]The case was tried prior to *Commonwealth* v. *King*, 445 Mass. 217, 241-249 (2005), cert. denied, 546 U.S. 1216 (2006), which issued a prospective rule altering the fresh complaint doctrine.

him of the offense that was corroborated by the fresh complaint testimony and the observations of an independent eyewitness.

*Judgment affirmed.*