COMMONWEALTH *vs.* RANDY ROBY.

Essex. February 6, 2012. - June 4, 2012.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, GANTS, DUFFLY, & LENK, JJ.

*Rape. Constitutional Law,* Indictment. *Evidence,* Indictment, First complaint, Cross-examination, Impeachment of credibility, Prior misconduct. *Practice, Criminal,* Indictment, Amendment of indictment or complaint. *Witness,* Impeachment.

There was no merit to the criminal defendant's claim that, at the trial of indictments charging rape of a child under the age of sixteen by force, he was convicted of a crime for which he was not charged, where, assuming that the judge's instructions to the jury effected an amendment to one of the indictments (i.e., changing the location of the offense from the defendant's automobile to a bedroom), the variance in location was not material and was one of form only; where the defendant suffered no prejudice from the variance; and where the variance did not materially affect the work of the grand jury. [402-405]

Discussion of the continuing vitality of the first complaint doctrine, and of the standard of review applicable to decisions on the admissibility of first complaint evidence. [407-408]

At the trial of indictments charging rape of two children under the age of sixteen by force, no substantial risk of a miscarriage of justice resulted from the erroneous admission in evidence of cumulative first complaint testimony [408-410]; further, the judge did not abuse his discretion in admitting testimony from the first complaint witness regarding computer images that the defendant allegedly showed to the children, where the evidence provided context for the first complaint witness's testimony [410].

At a criminal trial, the judge did not abuse his discretion in denying defense counsel an opportunity to impeach a Commonwealth witness with a murder indictment, where surprise testimony from the witness was collateral and did not materially differ from her prior testimony concerning the allegations that formed the basis of the charges against the defendant, and where the judge struck the testimony on the collateral matter and instructed the jury to disregard it; further, the judge did not abuse his discretion in declining to grant a mistrial, where, in the circumstances, the defendant did not suffer prejudice. [410-413]

There was no merit to a criminal defendant's claim that the judge at his trial improperly admitted prior bad act evidence. [413-414]

INDICTMENTS found and returned in the Superior Court Department on November 7, 2001.

After allowance of a motion for a new trial, filed on June 21, 2004, the cases were tried before *Howard J. Whitehead*, J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Rebecca Rose* for the defendant.

*Catherine Langevin Semel*, Assistant District Attorney, for the Commonwealth.

IRELAND, C.J. In 2001, an Essex County grand jury returned six indictments charging the defendant, Randy Roby, with rape of a child under the age of sixteen by force, G. L. c. 265, § 22A. At the defendant's first trial in November, 2003, the trial judge entered a required finding of not guilty on one of the indictments.[1] The jury returned guilty verdicts on the remaining indictments. However, in October, 2004, the judge allowed the defendant's motion for a new trial.

In December, 2008, the case proceeded to a new jury trial, before a different Superior Court judge, on the remaining five indictments. Although the indictments did not specify, the first three involved the child victim, Nancy, and the remaining two involved her half-sister, Toria.[2] At the close of the Commonwealth's evidence, the judge allowed the defendant's motion for required findings of not guilty on the charges of rape of a child by force as to Nancy, finding that there was insufficient evidence of the element of penetration, but submitted to the jury three charges of the lesser included offense of indecent assault and battery on a person under the age of fourteen, G. L. c. 265, § 13B. The judge also allowed the defendant's motion on the charges of rape of a child by force as to Toria, finding there was insufficient evidence of the element of force, but submitted to the jury two charges of the lesser included offense of statutory rape, G. L. c. 265, § 23. The jury convicted the defendant of all charges. The defendant appealed, arguing (1) that he was convicted of crimes for which he was not indicted

---

[1]The six indictments alleged rape of a child by force occurring on divers dates between January 1, 2000, and September 30, 2001. With the exception of the indictment on which the judge entered a required finding of not guilty, which referred to Danvers as the location of the incident or incidents, all of the alleged events took place in Peabody.

[2]Both pseudonyms.

in violation of his State and Federal constitutional rights; (2) error in the admission of first complaint testimony; (3) error by the judge's restriction of cross-examination of Toria and refusal to grant a mistrial; and (4) error in the admission of bad act evidence. We transferred the case here on our own motion. For the reasons that follow, we affirm the convictions.

1. *Background.* We summarize the relevant facts as the jury could have found them, reserving certain details for later discussion. In January, 2000, Nancy was six years of age and her half-sister, Toria, was ten years of age. The girls lived in Peabody with their mother, Paula,[3] who was divorced and worked full time. Paula's mother, the girls' grandmother, Arlinda (called Linda), regularly cared for the girls at her house in Peabody. When Linda babysat the girls, the defendant, who was her live-in boy friend, often would be present.[4]

Nancy testified that her relationship with the defendant changed when he began "touching her." During the period between January, 2000, and September, 2001, the defendant, in various rooms of the house, would reach his hand under Nancy's underwear, or pull down her pants and underwear, and touch the outside of her vagina with his fingers. This touching occurred once in the dining room, once in the exercise room, and more than ten times in the living room. When the touching occurred, others were often in the house, but not in the same room as Nancy and the defendant. In addition to the sexual touchings, the defendant once showed Nancy images of "half-naked" women on his computer and asked her if she could keep it a secret.

Toria testified that her relationship with the defendant changed around the same time period as her sister reported, starting when Toria was ten years of age. The defendant would have Toria sit on his lap to play computer games. On one occasion

---

[3]We use first names to ensure the privacy of the victims.

[4]Paula initially did not like the defendant. The defendant moved into Linda's home after they had been dating only one month. Paula felt that he was taking advantage of her mother. She also did not like the fact that he was significantly younger than Linda.

In 1996, Paula, the girls, and Paula's then husband lived with Linda (and the defendant). In the winter of 1997, Linda evicted them because Paula owed her rent money. Later, in 1998, after Paula "came to Christ," she reconciled with Linda and developed a "friendly" relationship with the defendant.

the defendant rubbed his hand on her leg and moved his hand higher up her leg while he was doing so. Another time, the defendant touched her vagina over her clothes. Several times the defendant put his hand inside Toria's pants, inserted his finger into her vagina and "move[d] it around." This occurred about ten times in the dining room and once in Linda's bedroom. In the basement, dining room, and once in the outside shed, the defendant would stand Toria up, lift up her shirt, and suck on her nipples. Several times after touching Toria, the defendant instructed her not to tell her sister.

Once, in the basement, Toria was sitting on the defendant's lap at his workbench. The defendant started tickling Toria, then pushed up her shirt over her head. Linda walked in and saw them, started yelling, and told Toria to get off of the defendant. Linda then went back upstairs.[5]

Toria also testified that on more than one occasion, the defendant showed her computer images of naked or "semi-dressed" women. The defendant showed her images of women grabbing their breasts and women who were spreading their legs "wide open." Neither girl observed the defendant touching the other girl in a sexual manner.

After Paula learned from the girls that the defendant had shown them computer images of undressed and partially undressed women, she went to Linda's house and had Linda enter his password on his computer. Paula found recently viewed Web sites, which were "triple-x sites." She "clicked on" one Web site that revealed images of naked women and advertised other Web sites to visit for illicit sex. Linda did not remember this, but did recall one instance where she found the defendant at his computer watching a young (but adult) woman "stripping."

After Paula learned about the defendant's having inappropriately

---

[5]Linda testified that this incident occurred in October, 2000. She went into the basement and found Toria sitting on the defendant's lap with her shirt off. The defendant was rubbing Toria's arm. Linda pulled out a box for Toria to sit on, but did not say anything. Linda never told her daughter what she had seen. She did speak with the defendant, who told her that Toria had taken her shirt off on her own initiative. The prosecutor elicited testimony that the defendant owed Linda thousands of dollars and that she was hoping he would pay her back. The prosecutor suggested during her closing argument that this was why Linda did not inform Paula of what had happened in the basement.

touched the girls, she asked her mother to have the defendant telephone her. When they spoke about this, four days later, the defendant said that he wanted to be the one who showed her girls how to "be with a man."

The defendant was the sole defense witness. He denied all the allegations. He claimed that he did not purposefully visit Web sites with images of naked women, but rather received such images because of then inadequate "spam" filtering. He acknowledged the incident in the basement with Toria that Linda observed, but maintained that Toria took off her shirt on her own initiative and then asked him to rub her back, which he did. He admitted to having borrowed money from Linda. He denied telling Paula over the telephone that he wanted to be the one to show the girls how to be with a man.

The theory of the defense was that none of the sexual touchings had ever occurred. The defendant's trial counsel suggested that they could not have occurred without having been observed because of the open floor plan of the house. He also argued that Paula had always resented him and had fabricated the events. Further, he claimed that the accusations were false because the girls did not disclose the abuse to a disinterested party for a long time.

2. *Discussion.* a. *Amendment of the indictments.* As relevant here, the indictments involving Toria alleged two offenses (rape of a child under the age of sixteen by force) that took place on "divers dates between January 1, 2000 and September 30, 2001" in Peabody, but otherwise did not specify where in Peabody. The grand jury heard testimony that the defendant had digitally penetrated Toria "at least three times," including once in the dining room of Linda's house, once in the defendant's automobile, and once in Danvers, but the trial judge entered a finding of not guilty on that indictment, see note 1, *supra*, and accompanying text. At the second trial, however, Toria testified that the defendant digitally penetrated her in the dining room about ten times and once in her grandmother's bedroom. After modifying the indictment to reflect two charges of statutory rape, the judge instructed the jury that a guilty verdict on each indictment required they unanimously find at least one occasion of the offense on Toria in the dining room and one occasion in

Linda's bedroom. Following the final charge, the defendant renewed his motion for a required finding of not guilty on the latter indictment, arguing that he had not been indicted for an offense that took place in Linda's bedroom. The judge denied the motion. The defendant argues this was error and that he was convicted of a crime for which he was not charged (i.e., statutory rape in Linda's bedroom) in violation of the Fifth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights.[6]

"Under Mass. R. Crim. P. 4 (d), 378 Mass. 849 (1979), a judge has discretion to allow an amendment of an indictment if the amendment is one of form, not substance, and if the amendment will 'not result in prejudice.' " *Commonwealth* v. *Miranda*, 441 Mass. 783, 787 (2004), quoting *Commonwealth* v. *Knight*, 437 Mass. 487, 491-492 (2002). "Article 12 . . . adds the requirement that the amendment not 'materially change[] the work of the grand jury.' " *Commonwealth* v. *Miranda, supra*, quoting *Commonwealth* v. *Knight, supra* at 492. Here, we assume without deciding that with his instructions to the jury, the judge effectively amended the last indictment (as specified in the grand jury evidence, see *Commonwealth* v. *American News Co.*, 333 Mass. 74, 77 [1955]) by changing the location of the offense from the defendant's automobile to Linda's bedroom. We conclude that this so-called variance in location was not material and was one of form only. "The time and place of the commission of the crime need not be alleged [in the indictment] unless it is an essential element thereof." G. L. c. 277, § 20. See *Commonwealth* v. *Megna*, 59 Mass. App. Ct. 511, 514-515 (2003). The location of the offense is not an element of either statutory or forcible rape. See *Commonwealth* v. *King*, 445

---

[6]The Fifth Amendment to the United States Constitution provides, in relevant part, that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury . . . ." Article 12 of the Massachusetts of Declaration of Rights reads, as relevant here, that "[n]o subject shall be held to answer for any crimes or offence, until the same is fully and plainly, substantially and formally, described to him . . . ." The defendant overlooks that the "right to a grand jury, secured by the Fifth Amendment to the United States Constitution, is not binding on the States through the due process clause of the Fourteenth Amendment." *Commonwealth* v. *McCravy*, 430 Mass. 758, 761-762 n.5 (2000), citing *Hurtado* v. *California*, 110 U.S. 516, 534-535 (1884). We thus analyze his claim only under art. 12.

Mass. 217, 222 n.3 (2005), cert. denied, 546 U.S. 1216 (2006) (*King*) (elements of rape of child under sixteen by force are [1] sexual intercourse or unnatural sexual intercourse with [2] child under sixteen years of age [3] by force or threat of bodily injury and [4] against child's will); *Commonwealth* v. *Knap*, 412 Mass. 712, 714 (1992) (elements of statutory rape are [1] sexual intercourse or unnatural sexual intercourse with [2] child under sixteen years of age). Thus, the variance in location may constitute a ground for acquittal only if the defendant was thereby prejudiced in his defense. *Commonwealth* v. *Megna*, *supra* at 515, quoting G. L. c. 277, § 35 ("A defendant shall not be acquitted on the ground of variance between the allegations and proof if the essential elements of the crime are correctly stated, unless he is thereby prejudiced in his defence"). See *Commonwealth* v. *Parrotta*, 316 Mass. 307, 309-310 (1944) (change in location not element of crime requiring acquittal unless defendant prejudiced in defense).

The variance did not prejudice the defendant. The purpose of an indictment is "to furnish the accused with such a description of the charge against him as will enable him to make his defence." *Commonwealth* v. *Montanino*, 409 Mass. 500, 512 (1991), quoting *United States* v. *Cruikshank*, 92 U.S. 542, 558 (1875). At the defendant's second trial, he had the benefit of the Commonwealth's evidence from the first trial, which included Toria's testimony that the defendant had digitally penetrated her in Linda's bedroom. Thus, the defendant had reasonable notice of the Commonwealth's position that the offenses occurred not only in the dining room, but also in Linda's bedroom. Any ambiguity as to the location of the offenses did not impact his defense that he never committed the offenses or that the allegations were fabricated because Paula did not like him. Although the defendant maintains that his defense could have been altered insofar as he suggested that the open floor plan of the first floor of the house bolstered his denial of the allegations, he could not have relied on such a claim before the variance. Nevertheless, in view of Toria's testimony at the first trial, no matter how arguably "unreliable," the defendant had full notice that his "open floor plan" defense would not necessarily be responsive to the allegation of penetration in the bedroom. In the cir-

cumstances, we determine that there was no prejudice. See
*Commonwealth* v. *Conefrey*, 420 Mass. 508, 511 n.6 (1995) (no
prejudice where defendant had benefit of evidence at first trial
concerning challenged variance at second trial).

Last, the variance did not materially change the work of the
grand jury. See *Commonwealth* v. *Miranda*, *supra* at 790. The
grand jury were told that the incidents involving Toria alleged
offenses (rape of a child under sixteen years of age by force)
that happened "at least three times." Although the prosecutor
had identified three locations where such offenses had occurred,
the location of the offense is not an element of the offense and
was not set out in the indictments (except identifying the town).
Rather, the grand jury returned indictments involving Toria and
alleging rape of a child by force "on divers dates between Janu-
ary 1, 2000 and September 30, 2001," and did not limit the of-
fenses in number or to any specific location other than the
town. Thus, the charge with the location "change" was never
precluded by the grand jury.

b. *First complaint testimony.* Prior to trial, the Commonwealth
moved to introduce the testimony of Paula as the first complaint
witness for both Nancy and Toria, even though the girls had
talked first to each other. The judge allowed the motion, determin-
ing that in view of the facts that the girls were very young and
both were complainants, it was appropriate to admit Paula's
testimony because she was the first adult and first noncomplain-
ant who had been told about the sexual assaults.[7] The defendant
did not object to this ruling.

At trial, Nancy testified that on one occasion she told her
sister "what was happening" and "all [that Toria] did was say
that it was happening to [her] too." The defendant did not
object to this testimony. Toria also testified that she had spoken
once to Nancy about what was happening.[8] Toria stated that

---

[7]The judge reasoned: "I don't think when you have two named victims of
that age and one is said to have told another one, I don't think that qualifies
as first complaint, or arguably it does, but . . . it doesn't preclude the Com-
monwealth from offering a later complaint to an adult. I don't think the first
complaint doctrine was meant to encompass the complaints that victims make
— young, very young victims make to each other."

[8]The defendant objected to this testimony, but only on the basis that Toria's
answer was not responsive to the question. The judge overruled the objection.

Nancy "went into detail" about what was happening to her and Toria just said, "Me too." The judge did not provide any cautionary or limiting instructions concerning this testimony.

Nancy also testified that in September, 2001, while in a supermarket, she first told her mother about the defendant touching her. Nancy recalled that earlier that day, while in her grandmother's dining room, she had told her mother that the defendant had shown her images of "half-naked women" on his computer.[9]

Toria testified that one day in September, 2001, at her grandmother's house, she asked her mother for permission to use the Internet. Paula said no because there might be pornography.[10] Nancy asked what pornography was. After Paula explained, Nancy stated that she had seen that before and Toria added that she had also. Over the defendant's objection, which the judge overruled, Toria testified that Paula asked where they had seen it, and the girls told her that the defendant had shown it to them.[11] Paula left. Toria testified that a few days later, she told her mother that the defendant had touched her. Toria did not remember where the disclosure had occurred or if her sister had been present, but did recall that her grandmother had not been present.

Paula testified that, on September 23, 2001, she brought the girls to her mother's house. The defendant was not there. The girls asked to use the Internet and Paula told them no, explaining to them that it was "unfiltered" and they "could find things that [they] aren't supposed to see." Nancy told Paula that the defendant had already shown her "pictures of women with shirts and no pants," and Toria added that she had seen "pictures of women with no clothes on." Paula left, but soon returned to

---

[9]This testimony was admitted after the defendant had objected to the lack of a time frame in, and the "overly broad" nature of, the question that solicited the testimony. The judge concluded that the testimony was helpful to give context to the jury concerning how the first complaint arose. Nancy testified that she told her mother about the images because the defendant had told her not to.

[10]The defendant objected to Toria's use of the word "pornography." The judge overruled the objection because it was the word spoken, but instructed the jury that, regarding the computer images shown, all they had heard was "a particular description from the witness" and the "classification" was for them to decide.

[11]The defendant states that the record reflects that Toria also told her grandmother about the images on the computer, but the record appears to us to be unclear on this matter.

bring the girls home.[12] That night, she returned to Linda's house and asked her mother to enter the defendant's password into his computer, and found the "triple-x" Web sites. A couple of days later, she asked Nancy if the defendant had touched her and Nancy replied that the defendant had touched her under her shirt and down her pants. Paula testified that on that day or the following day, she asked Toria if the defendant had touched her, and Toria replied, "Yes." Paula stated that she did not recall whether she had spoken to the girls together or separately.

Before Paula testified about learning from the girls that the defendant had shown them computer images of undressed or partially undressed women and that the defendant had touched them in a sexual manner, the judge gave proper limiting first complaint instructions in accordance with *King, supra* at 247-248. He also instructed the jury on the subject in his final charge.

i. *First complaint doctrine.* In *Commonwealth* v. *Aviles,* 461 Mass. 60, 71 (2011) (*Aviles*), we affirmed the continued vitality of the first complaint doctrine as set forth in *King, supra,* and its progeny, and set forth a brief overview:

> "In *King,* we replaced the doctrine of 'fresh complaint' with the doctrine of 'first complaint' to reflect 'a contemporary understanding of information that will permit jurors to make a fair assessment of a sexual assault complainant's credibility.' *King,* [*supra*] at 237. See generally Mass. G. Evid. § 413 (2011). Pursuant to the first complaint doctrine, we 'no longer permit in evidence testimony from multiple complaint witnesses, limiting the testimony to that of one witness' who, where feasible, will be the first person told of the sexual assault. *King, supra* at 242-243. Such witness 'may testify to the details of the alleged victim's first complaint of sexual assault and the circumstances surrounding that first complaint as part of the prosecution's case-in-chief.' *Id.* at 243. Where a first complaint witness testifies at trial regarding the complaint, the complainant also may testify about the details of the first complaint and the reasons why it was made at that

---

[12]There was conflicting evidence concerning what transpired later that day, after Paula left. Toria and Linda recounted that the girls had spent the remainder of the day with Linda and they brought lunch to the defendant.

particular time. See *id.* at 245. What the complainant may not do, however, is testify to the fact that she 'told' others, apart from the first complaint witness, about the sexual assault, even where the details of the conversation have been omitted. See *Commonwealth* v. *Arana*, 453 Mass. 214, 223 (2009)[;] *Commonwealth* v. *Monteiro*, 75 Mass. App. Ct. 489, 493 (2009). See also *Commonwealth* v. *Stuckich*, 450 Mass. 449, 456-457 (2008)[.] Such testimony 'is the equivalent of saying that [the complainant] repeated her account of the incident, i.e., it allows fresh complaint testimony through the back door. Repetition of the narrative tends to enhance the credibility of the complainant to the prejudice of the defendant.' *Id.* at 457." (Footnotes omitted.)

*Aviles, supra* at 67-68. First complaint testimony is admissible only where "the fact of the assault or the issue of consent is contested." *King, supra* at 247.

In *Aviles, supra* at 73, we modified the scope of appellate review of decisions on the admissibility of first complaint evidence. We explained:

"The judge who is evaluating the facts of a particular case is in the best position to determine the scope of admissible evidence, keeping in mind the underlying goals of the first complaint doctrine, our established first complaint jurisprudence, and our guidelines for admitting or excluding relevant evidence. . . . Once a judge has carefully and thoroughly analyzed these considerations, and has decided that proposed first complaint evidence is admissible, an appellate court shall review that determination under an abuse of discretion standard."

*Id.*

ii. *Cumulative first complaint testimony.* Where the judge permitted Paula to testify as the first complaint witness,[13] the girls' testimony that they first told each other about the defend-

[13]In his brief, the defendant states that he does not challenge Paula's first complaint testimony, but contends that the judge failed to make the requisite findings to support Paula's substitution as the first complaint witness. Indeed, "[i]n limited circumstances . . . a judge may permit the testimony of a complaint witness other than the individual to whom the victim first disclosed the assault." *Commonwealth* v. *Hoyt*, 461 Mass. 143, 156-157 (2011). For

ant's having inappropriately touched them should not have been admitted. See *King, supra* at 243 (under first complaint doctrine, only one complainant witness is permitted to testify). The defendant did not object to the admission of their respective testimony on this ground, see note 8, *supra,* and does not argue that the failure to object was the result of a tactical decision by his trial counsel. See note 8, *supra.* See also *Commonwealth* v. *McCoy,* 456 Mass. 838, 853 (2010). Where the defense was that the touchings did not happen at all, that the accusations were false because the girls did not disclose the abuse to a disinterested party for so long, that the abuse would have been discovered in view of the open floor plan of the house, and that the accusations were fabricated because Paula hated the defendant, there does not appear to be any strategic reason for the defense to have withheld an objection to the girls' testimony concerning their complaints to each other. We add, in considering whether the admission of the testimony created a substantial risk of a miscarriage of justice, see *Commonwealth* v. *McCoy, supra* at 846, that the testimony was brief and provided no details of the alleged sexual encounters. The testimony also was "weak" because it could have been viewed as inherently biased, as both girls were making claims against the defendant. Thus, the testimony could not have served to counteract any perception that their remaining silent following the sexual assaults meant that they may have fabricated their claims. See *Commonwealth* v. *Murungu,* 450 Mass. 441, 446 (2008). Last, the prosecutor did not use the testimony in her closing argument to bolster the girls' credibility. In these circumstances, there was no substantial

example, substitution may be appropriate "where the first person told of the alleged assault is unavailable, incompetent, or too young to testify meaningfully." *Commonwealth* v. *King,* 445 Mass. 217, 243-244 (2005), cert. denied, 546 U.S. 1216 (2006). "The substituted witness should in most cases be the next complaint witness, absent compelling circumstances justifying further substitution." *Commonwealth* v. *Murungu,* 450 Mass. 441, 446 (2008). In this case, Toria was Nancy's first complaint witness and Nancy was Toria's. In view of their young age at the time of the disclosures, no abuse of discretion occurred when the judge permitted Paula to testify as the first complaint witness. The lack of findings is inconsequential. Findings are only required in certain circumstances, "such as in the case of bias on the part of the witness." *Id.* at 446-447. The record clearly reflects the concerns of the judge, who was confronted with a novel situation.

risk of a miscarriage of justice resulting from the cumulative first complaint testimony.

iii. *Scope of the first complaint evidence.* The defendant argues that he was prejudiced by the admission of testimony regarding the computer images of women he allegedly showed to the girls. He asserts that, because this evidence did not allege a sexual assault, it did not qualify as a complaint but amounted to the improper admission of bad act evidence. We conclude that the judge did not abuse his discretion in admitting this evidence. See *Aviles, supra* at 73. The evidence was properly admitted to provide context to Paula's first complaint testimony. See *King, supra* at 246 (under first complaint doctrine, witness may testify to "the events or conversation that culminated in the complaint"). The evidence explained why Paula would ask the girls if the defendant had touched them or why they suddenly would come forward with the allegations that he had done so. The testimony furthered the goal of the first complaint doctrine "to give the jury as complete a picture as possible of how the accusation of sexual assault first arose." *Id.* at 247. "That complete picture . . . allow[ed] them to make a fairer and more accurate assessment of the validity of that accusation, based on specific information about the people involved rather than on outdated stereotypes and generalities." *Id.* Finally, the judge instructed the jury that it is "not a crime" to look at images "of naked or semi-naked women on the computer" and that no proclivity to commit crimes, sexual or otherwise, could be inferred from such conduct.

c. *Restriction of cross-examination of Toria and refusal to grant mistrial.* In December, 2007, Toria was charged in Middlesex County with murder. Before the opening statements at the defendant's second trial in December, 2008, the Commonwealth moved to preclude the defendant from impeaching Toria with the murder indictment. Defense counsel argued, however, that Toria might be biased in testifying at the second trial because, on information and belief, her defense to the murder indictment was based on posttraumatic stress disorder resulting from having been sexually assaulted by the defendant. The judge stated that, in accordance with *Commonwealth* v. *Haywood,* 377 Mass. 755, 762-763 (1979), he would not allow the impeachment absent a material change in Toria's forthcoming trial testimony.

Surprising both the prosecutor and the defendant at the second trial, Toria testified that in the backyard shed the defendant had sucked on her nipples and had painted a yellow flower onto one of her nipples. On cross-examination, defense counsel tried to impeach her, questioning why she was revealing this incident for the first time on the stand. Toria, however, claimed that "years ago" she had told a victim witness advocate about it.

Before the testimony of the next witness, defense counsel moved to recall Toria so that he could impeach her with the murder indictment, arguing that Toria's testimony concerning the painting of her nipple was a material deviation from her previous testimony. The prosecutor objected, asserting that the testimony did not pertain to a charged offense and noted that Toria never wavered from her assertions of digital penetration. The prosecutor stated that she had no knowledge of this allegation and would not refer to it during her closing argument. The judge acknowledged that the new testimony, if believed, might add credence to Toria's other claims due to what the jurors may perceive as a kind of "kinkiness," but expressed his view that any potential impact was limited by the collateral nature of the testimony and the prosecutor's representation that she would not reference this evidence during her closing argument. The judge concluded that the probative value of the evidence was minimal and that the prejudicial impact of the murder charge would be "very substantial," and excluded the evidence over the objection of defense counsel.

The next day before any testimony was taken, defense counsel moved for a mistrial, arguing that Toria's testimony concerning the painting of her nipple amounted to a prior bad act of the defendant of which he was not given notice. He suggested that the evidence was very damaging, likely having a "cumulative effect down the line," and expressed doubts that any curative instruction could mitigate the prejudice. The judge determined that granting a mistrial would be harsh and instead struck the testimony, providing the following cautionary instruction to the jury:

> "Members of the jury, you heard testimony yesterday from [Toria] that there was an episode in the shed where

[the defendant] allegedly painted a flower on one of her nipples. That testimony is going to be stricken, and by that, I mean deleted, from the record. And you should delete it from your mind for this reason: up until the time that testimony was provided on the witness stand, no information to that effect was in the hands of either the prosecutor or the defense attorney, so there was no opportunity to deal with it or to verify it. So you must disregard that testimony. It's really important. I know it's hard to, sort of, put the paste back in the tube, but you really must disregard that testimony. If you have a note on it, scratch the note out.[14] And do not let it play any role in your deliberations."

The defendant argues that the judge abused his discretion by failing to allow defense counsel to impeach Toria with the murder indictment and by failing to declare a mistrial. We first address the exclusion of the impeachment evidence.

"Arrest or indictment alone is insufficient for general impeachment purposes." *Commonwealth* v. *Haywood, supra* at 759, citing G. L. c. 233, § 21. However, "a criminal defendant is 'entitled, as of right, to reasonable cross-examination of a witness for the purpose of showing bias, particularly where that witness may have a motivation to seek favor with the government.' " *Commonwealth* v. *Haywood, supra* at 760, quoting *Commonwealth* v. *Dougan*, 377 Mass. 303, 310 (1979). This right is not limitless. Where a witness has made statements or given testimony that predates the charge at issue, there typically must be a "material" change of the witness's testimony postdating the charge to render it subject to impeachment. See *Commonwealth* v. *Haywood, supra* at 762-763. See also *Commonwealth* v. *Santiago*, 54 Mass. App. Ct. 656, 663 (2002). Absent such a material change in testimony, cross-examination on the pending charge may properly be denied "because there is no basis for arguing that the criminal charge[] caused the witness to be biased in favor of the Commonwealth." *Commonwealth* v. *Purcell*, 423 Mass. 880, 884 (1996). The decision whether to allow such impeachment testimony is reviewed for an abuse of discretion. See *id.*; *Commonwealth* v. *Haywood, supra* at 763.

---

[14]The jury were permitted to take notes at the trial.

The testimony concerning the alleged painting of Toria's nipple did not pertain to the charges (statutory rape) against the defendant. The judge, thus, correctly determined that such testimony was collateral and did not materially differ from Toria's prior testimony concerning the allegations that formed the basis of the charges, namely, that the defendant had digitally penetrated her. In any event, the defendant overlooks that the judge struck the testimony and instructed the jury to delete it from their minds and disregard it. "Jurors are presumed to follow a judge's instructions, including instructions to disregard certain testimony." *Commonwealth* v. *Williams*, 450 Mass. 645, 651 (2008). As such, even if an abuse of discretion occurred, the defendant suffered no prejudice.

The judge did not abuse his discretion in declining to grant a mistrial. See *Cruz* v. *Commonwealth*, 461 Mass. 664, 669-670 (2012) (decision to declare mistrial within sound discretion of trial judge). Toria's testimony came as a surprise to both parties and was not occasioned by any wrongful conduct by the prosecutor. Her testimony did not bear on the charged conduct. As mentioned, the judge instructed the jury to disregard the testimony and the jurors are presumed to follow such instructions, see *Commonwealth* v. *Williams, supra.* In instructing the jury, the judge somewhat impugned Toria's credibility because he told the jury that neither the defense nor the prosecution was told of the incident, which contradicted Toria's testimony that she had disclosed the incident to a victim witness advocate.[15] In the circumstances, there was no prejudice to the defendant from the late disclosure of this new incident.

d. *Bad act evidence.* The defendant argues that the judge abused his discretion in admitting "numerous incidences of non-charged criminal behavior and prior bad act[]" evidence amounting to prejudicial propensity evidence that created a substantial risk of a miscarriage of justice. He points to the evidence of images of naked or semi-naked women on his computer, an issue we have already addressed and determined to be properly admitted to show context of the first complaint testimony. He also points to the incident in which Toria testified

[15]Toria's testimony was a proper response to a question posed during cross-examination. The testimony on the subject, as noted, was struck.

that the defendant painted a flower on one of her nipples, which we have also addressed. Concerning the defendant's remaining claims, including the admission of evidence regarding the number of times the defendant sexually touched each of the girls, such evidence was admissible to show "common scheme, pattern of operation, [and] absence of accident," here, undermining the defendant's explanation for the presence of Toria on his lap without a shirt on when Linda walked into the basement. See *Commonwealth* v. *Dwyer*, 448 Mass. 122, 128 (2006), quoting *Commonwealth* v. *Marshall*, 434 Mass. 358, 366 (2001). The evidence was properly admitted.

*Judgments affirmed.*