NOTICE: All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports. If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

16-P-257                                          Appeals Court


COMMONWEALTH  vs.  JEFFREY LEWIS.


No. 16-P-257.

Essex.      December 12, 2016. - June 7, 2017.

Present:  Hanlon, Carhart, & Neyman, JJ.[1]


Rape.  Assault and Battery.  Evidence, First complaint.
    Practice, Criminal, Instructions to jury.



    Indictments found and returned in the Superior Court
Department on September 5, 2013.

    The cases were tried before Joshua I. Wall, J.


    James P. Vander Salm for the defendant.
    Catherine Langevin Semel, Assistant District Attorney, for
the Commonwealth.


    HANLON, J.  After a jury trial, the defendant was convicted

of four counts of rape, in violation of G. L. c. 265, § 22(b),

and one count of assault and battery in violation of G. L.


_____

    [1] Justice Carhart participated in the deliberation on this
case prior to his retirement.

c. 265, § 13A.[2]  He appeals, arguing that his convictions should be reversed because evidence was admitted improperly in violation of the first complaint doctrine.  See Mass. G. Evid. § 413 (2017).  This error, he argues, combined with what he describes as inadequate limiting instructions, resulted in prejudicial error.  For the reasons that follow, we affirm.

Background.  The jury could have found the following facts. In September, 2012, the victim met the defendant at a "club" in Lawrence; they had a "whirl wind romance really.  He said all the right things, and [she] fell in love with him within a week."  A little more than a month into the relationship, however, things began to change.  The defendant began to drink heavily, and, when he was drinking, he became rude and mean to the victim, as well as controlling -- particularly in public.[3] The victim would sometimes not see the defendant for days at a time when he was drinking; he would "basically disappear" and she would "end up having to find him."  During this time, the victim was living in North Andover with her three children, and the defendant was living on a friend's couch.  Despite the

_____

[2] The defendant was charged with assault and battery by means of a dangerous weapon (to wit, a wall), in violation of G. L. c. 265, § 15A(b), but was convicted of the lesser included offense of assault and battery.

[3] The victim testified that, in public, the defendant wanted her to be subservient, calling him "sir," and keeping quiet in front of his friends so that "they knew, you know, he was the man."  At home, she was permitted to speak freely.

defendant's behavior when he was drinking, their relationship continued because, according to the victim, she was in love with him and he did not behave that way all the time.

a.  January 1, 2013, rape.  By New Year's Eve, 2012, the relationship between the victim and the defendant was "rocky," but they had made plans to go out and celebrate that evening. The victim picked up the defendant from work at approximately 4:00 P.M. and left him at his friend's house to shower and dress.  Afterwards, she was unable to get in touch with him during the rest of the evening; she believed that he had turned his cellular telephone off because the calls went directly to voice mail.  Eventually, at approximately 1:00 A.M. on January 1, she found him at his sister's house in Haverhill, sitting on the porch.

The victim was upset and angry, and the "clearly drunk" defendant apologized and told her that his telephone had died. He invited her into the house to talk and, when they went inside, no one appeared to be home.  They went into his mother's bedroom and the victim was "crying still."[4]  The defendant then pulled down his pants and instructed the victim to "lick his ass," saying that, if she would not do it, he would find someone else.  The victim testified that nothing like that had happened

---

[4] The defendant's mother was not home at the time.

before in their relationship and she told him "to go ahead and find somebody else."

She stood up to walk out the door and the defendant grabbed her, pulled her underwear and pantyhose down, turned her around and threw her to the ground face down. He shoved her face into the carpet and put his penis into her vagina. The victim told him to stop, that she could not breathe, and that he was hurting her. The defendant responded that she was his and he would do whatever he wanted. After ejaculating inside of her, the defendant fell asleep on his mother's bed. The victim eventually fell asleep at the end of the bed still crying.[5] The next day, the victim saw on the defendant's cellular telephone that he had been conversing with another woman the previous night when he was supposed to be out with her; she then ended the relationship. The victim did not report the rape to the police at that time because she "didn't really think anything at the time of it. [They] had had rough sex before." She testified, "It just didn't -- I don't know. Nothing really clicked at the time."

---

[5] The victim testified that prior to this incident, she and the defendant had a consensual sexual relationship, and she "had never told him to stop before"; this sexual encounter "was mean . . . [and] seemed cruel."

b.  July 8, 2013, rape.  In February, 2013, the victim and the defendant resumed their relationship.[6]  On May 1, 2013, they moved together into an apartment in Haverhill; the victim's two youngest children moved in with them full time by July, 2013.  Shortly thereafter, the defendant began going out frequently and coming home drunk early the next morning.  During the evening of July 7, 2013, the victim telephoned the defendant and sent text messages to him, but she received no response; she then sent him a text message telling him not to come home because she was tired of his behavior -- specifically, going out every night.  The defendant responded that he would leave when he was ready.

In the early morning hours of July 8, 2013, while the victim and her daughters were sleeping, the defendant came home drunk and attempted to get into the bed with the victim.  As she was trying to push him out, the defendant slapped her in the face, and she slapped him back.  The defendant then straddled her, sitting on her stomach, pinning her arms down with his knees, and "started hitting [her] over and over and over again" in the face, calling her a "slut," and saying that she "deserved it."  The victim was crying and telling the defendant to stop; at some point, she was able to get her hand free and scratch

---

[6] The victim testified, "He was sweet again.  He tried.  He started spending time with me.  He was making an effort spending time with my kids.  We spent time together with his son.  We started doing things together."

him.  The defendant then flipped her onto her stomach and put his penis in her vagina; he was holding the victim's hands above her head with one hand, with his other hand around her neck. While he was raping the victim, the defendant was telling her that, if she did not say she liked this treatment, he would hit her again.  The victim did not report the incident to the police at that time because, she testified, she loved him and "probably would have tried to work anything out with him.  And . . . [she] wanted to see if when he sobered up, it was different."

c.  July 11, 2013, rapes.  A few nights later, the defendant was out all night and came home at 6:00 A.M. with his friend Adrian.  They were both drunk, and Adrian slept on the living room couch.  In response to the defendant's demand, the victim got Adrian a blanket and pillow, and then went back into their bedroom where she had been asleep.  The defendant came into the bedroom where the victim was sitting on the edge of the bed; he then forced his penis into her mouth, pushing the back of her head forward and up and down with his hands.  The victim was able to pull away, and then ran to the bathroom and vomited.

When the victim returned to the bedroom, the defendant told her to take off her clothes.  She told him that she did not feel well; he responded that if she did not do so, he would.  In response, she began, hesitantly, to remove her top, but the defendant became impatient and grabbed the victim.  He pulled

off her pants so that she was lying "sideways" on the bed; he then put his penis into her vagina while keeping one hand around her neck. Afterwards, the defendant went out to the living room and fell asleep on the other couch. The victim did not at that time call the police because she "didn't look at it as rape still at that point."

Later that morning when the defendant woke up, the victim told him to pay her his half of the rent and to move out. The defendant started to put his clothes in a laundry basket to take with him; the victim sat in the basket so that he could not take his belongings until he paid her. Instead, the defendant threw the basket, with the victim in it, across the room causing the victim to hit her head on the door frame and her knee on the wall. They continued to argue, and the defendant called the police, saying, according to the victim's testimony, that "[i]t's going to be so funny watching you get taken away from your kids, I'm going to sit there and smile and laugh as you're being hauled off in handcuffs right in front of your children." Eventually, after speaking with the victim, the responding police officers arrested the defendant for assaulting the victim.

Later that same day, July 11, 2013, the victim went to the Haverhill Division of the District Court Department to file an application for an abuse prevention order against the defendant

pursuant to G. L. c. 209A (restraining order).[7]  During the process of completing the necessary paperwork, the victim spoke with a victim witness advocate.  She was given a sheet posing questions, including the question whether the person she was with had ever forced her to have sexual intercourse when she did not want it.  After reading the questions, the victim began to cry, realizing, she said, that the defendant had done that to her several times.  The victim's affidavit in support of her restraining order application was admitted at trial as an exhibit.  It mirrored her testimony about what she said had occurred on July 8, and she testified that the affidavit was the first time that she had "disclosed in any fashion what had happened on July 8 of 2013."  After completing the paperwork, the victim was sent to the Haverhill police station, where she met with Detective Joseph Benedetti.  In that meeting, she disclosed to Detective Benedetti the details of the July 11 rapes.

At trial, the defendant objected, arguing that this was a second complaint, not admissible under the first complaint doctrine.  The judge overruled the objection, saying, "I still regard it as a first complaint as to the July 11th" incident, cautioning that no further complaint testimony about the July 8

---

[7] The jurors were not permitted to hear that the victim went to court to obtain a restraining order against the defendant.

incident would be permitted. He then gave a thorough limiting instruction to the jury; the defendant did not object to the instruction. The victim then testified very briefly about what she had told the detective regarding the July 11 incidents.[8] In the next question, the prosecutor said, "Okay. And after you spoke with Detective Benedetti -- strike that. When you spoke with Detective Benedetti, did you tell him about what had happened on New Year's Eve?" The victim responded, "I did."[9] She gave no details and there was no objection or motion to strike. The prosecutor then moved on to a different line of questioning with no follow up. On cross-examination, defense counsel questioned the victim extensively about the timing of that report and the victim conceded that she may have told the detective about the January 1 rape in a later meeting.

Detective Benedetti testified that he spoke with the victim at the police station on July 11, 2013, and that she spoke to him about both the July 8 and July 11 rapes; he took pictures of

---

[8] When asked what she had told the detective, the victim responded, "The same thing that I -- that I just testified about here, about him coming home, trying to force me to perform oral sex on him, him grabbing me, pulling me down on the bed, penetrating me, threatening me, choking me."

[9] The prosecutor told the judge that she had expected the answer to her question to be no -- that the victim had not told the detective about the rape on New Year's Eve. The prosecutor had informed the judge earlier that there would be no first complaint testimony for the January 1, 2013, rape because the victim's first disclosure of that incident occurred during her grand jury testimony.

bruising and cuts on her body from the rapes that had occurred earlier that day.  Benedetti himself recounted the specifics only of what the victim had told him about the July 11 incidents.[10]  He denied that the victim had told him about the January 1 rape at all.

Immediately after this testimony, the judge gave an abbreviated limiting instruction, referring back to the first complaint instruction that the jury had heard the day before when the victim testified.[11]  The defendant did not object to that instruction.  The following day, at the end of the trial, as part of his final charge to the jury, the judge provided a full instruction on the use of first complaint evidence relating

---

[10] The judge carefully limited any testimony about whether the victim had spoken with the detective about the July 8 rape; the detective was permitted to answer only "Yes or no" to that question.  There was no objection.  Even though, as the defendant argues, the fact that the detective answered "yes" to the question whether the victim had told him about the July 8 rape could be considered a subsequent complaint, we see no abuse of discretion.

[11] Specifically, the judge said, "So the information that the detective was just recounting about what [the victim] told him, that is information that you received an instruction on yesterday.  So that rather complicated instruction applies to this as well as the information yesterday.  So your -- the gist of the instruction is that you're to use this information to evaluate the timing of the complaint, when did the person make the complaint, and under what circumstances did the person make the complaint.  And then you can evaluate whether the complaint affects the credibility of the person either positively or negatively."  There was no objection.

only to the July 8 and July 11 rapes; the defendant did not object to any part of the judge's final instructions.

Discussion. The defendant contends that his trial was "rife with violations of the first complaint doctrine" and that, as a result, his convictions should be reversed.

a.    Admission of first complaint testimony.  The defendant first argues that the judge, improperly and over objection, permitted Detective Benedetti to testify about the victim's complaint of the July 11 rapes.  In the defendant's view, this was a second "first complaint" witness whose testimony unfairly bolstered the victim's credibility.[12]  We review the judge's decision for an abuse of discretion, see Commonwealth v. Aviles, 461 Mass. 60, 73 (2011), and we conclude that, in the circumstances presented in this case, where the two proffered complaints related to two separately charged offenses that took place on separate, specified dates, their admission did not constitute an abuse of discretion.

In Commonwealth v. King, 445 Mass. 217 (2005), cert. denied, 546 U.S. 1216 (2006), the Supreme Judicial Court "replaced the doctrine of 'fresh complaint' with the doctrine of 'first complaint' to reflect 'a contemporary understanding of

---

[12] The initial first complaint evidence was the affidavit, filed in support of the victim's application for a restraining order and redacted so that it described only the July 8 rape. As noted, the affidavit was admitted without objection at trial.

information that [would] permit jurors to make a fair assessment of a sexual assault complainant's credibility.' King, 445 Mass. at 237. See generally Mass. G. Evid. § 413 (2011). Pursuant to the first complaint doctrine, [the courts] 'no longer permit in evidence testimony from multiple complaint witnesses, limiting the testimony to that of one witness' who, where feasible, will be the first person told of the sexual assault. King, supra at 242-243. Such witness 'may testify to the details of the alleged victim's first complaint of sexual assault and the circumstances surrounding that first complaint as part of the prosecution's case-in-chief.' Id. at 243. Where a first complaint witness testifies at trial regarding the complaint, the [alleged victim] also may testify about the details of the first complaint and the reasons why it was made at that particular time. See id. at 245. What the [alleged victim] may not do, however, is testify to the fact that she 'told' others, apart from the first complaint witness, about the sexual assault, even where the details of the conversation have been omitted. See Commonwealth v. Arana, 453 Mass. 214, 223 (2009) . . . ; Commonwealth v. Monteiro, 75 Mass. App. Ct. 489, 493 (2009)." Aviles, supra at 67-68.

Since King, the cases have permitted the admission of more than one complaint witness in a number of specified

circumstances.[13]  In King itself, the court stated that the "testimony of a complaint witness other than, and in lieu of, the very 'first' complaint witness" is permitted where "the first person told of the alleged assault is unavailable, incompetent, or too young to testify meaningfully."  King, supra at 243-244.  There, the judge had exercised discretion in allowing two "fresh" complaint witnesses to testify so as to corroborate that the child victim's complaints of sexual abuse were "reasonably prompt."  Id. at 233.  The court saw no error. Id. at 235-236.  See Commonwealth v. Murungu, 450 Mass. 441, 445-446 (2008) ("The present case provides us an opportunity to detail two such additional exceptions.  The first is when the encounter that the victim has with the first person does not constitute a complaint, when, for example, the victim expresses to that person unhappiness, upset or other such feelings, but does not actually state that she has been sexually assaulted. The second is when there is such a complaint, but the listener has an obvious bias or motive to minimize or distort the victim's remarks").

---

[13] In addition, "while the first complaint testimony prohibits the 'piling on' of multiple complaint witnesses, Commonwealth v. Murungu, 450 Mass. 441, 442-443 (2008), it does not exclude testimony that 'is otherwise independently admissible' and serves a purpose 'other than to repeat the fact of a complaint and thereby corroborate the [alleged victim's] accusations.' Commonwealth v. Arana, 453 Mass. [at] 220-221, 229." Commonwealth v. McCoy, 456 Mass. 838, 845 (2010).  See Commonwealth v. Aviles, 461 Mass. at 69.

In Commonwealth v. Kebreau, 454 Mass. 287, 294 (2009), the court held that the judge properly had allowed two first complaint witnesses to testify because "the disclosures involved multiple and increasingly more serious assaults during a lengthy period. The two disclosures were made separately, one toward the beginning and the other at the end of this period, and they concerned significantly different types of assault." There, the victim's mother was allowed to testify about her daughter's complaint at the very beginning of the defendant's sexual abuse of his daughter. At the time of the complaint, the victim was in seventh or eighth grade and the offense itself was less serious than what would follow. Because the abuse escalated over a lengthy period, into the victim's college years, her college academic advisor was permitted to testify about a complaint of rape that the victim made at the end of that period. Id. at 290. The court noted that "[t]he defendant was charged separately with different offenses arising out of the different circumstances," id. at 294, and that the "prosecutor described with specificity the different acts encompassed by each disclosure and the time period in which those acts occurred." Id. at 296.

Several years after King, in Aviles, 461 Mass. at 72-73, the court observed that "it ha[d] become apparent that trial judges need greater flexibility to deal with the myriad factual

scenarios that arise in the context of purported first complaint evidence. Rules, because of their inherent inflexibility, tend to break down when it becomes necessary to address factual circumstances not yet contemplated by the established rubric. Rather than considering the first complaint doctrine as an evidentiary 'rule,' it makes greater sense to view the doctrine as a body of governing principles to guide a trial judge on the admissibility of first complaint evidence. . . . The judge who is evaluating the facts of a particular case is in the best position to determine the scope of admissible evidence, keeping in mind the underlying goals of the first complaint doctrine, our established first complaint jurisprudence, and our guidelines for admitting or excluding relevant evidence. See Mass. G. Evid. §§ 401-403 (2011)."

In this case, the defendant was charged with three separate incidents of rape on July 8 and 11, each occurring under different circumstances. The victim first disclosed the details of the July 8 rape in her affidavit filed with the District Court in support of her application for a restraining order. The details of the July 11 rapes were first disclosed to Detective Benedetti during his meeting with the victim on that same day. To be sure, the court in Kebreau "emphasize[d] that the Commonwealth may not introduce a 'parade of multiple complaint witnesses' in a case involving repeated instances of

abuse by a single defendant."  454 Mass. at 296, citing

Commonwealth v. Stuckich, 450 Mass. 449, 457 n.11 (2008).

However, this is not such a case.

Here, there were two types of first complaint evidence --
the restraining order affidavit and the detective's testimony --
each describing the victim's disclosure of separate rapes, on
different days, and each charged separately in indictments then
on trial.  The July 8 and 11 rapes could have been tried
separately, and there is no question that, in individual trials,
first complaint evidence would have been permitted for each.  In
addition, the trial judge carefully limited each piece of first
complaint evidence to the facts of one rape, thus forestalling
any multiple complaints about the same rape.

What happened in this case is therefore very different from
the "piling on" practice that was the focus of the court's
concern in King, 445 Mass. at 235-236.[14]  Nor did this case

---

[14] "While attentive to the potential dangers of the
prejudicial 'piling on' of fresh complaint testimony, . . . our
courts have permitted two or more fresh complaint witnesses to
testify concerning the details of the complaint.  See, e.g.,
Commonwealth v. Kirkpatrick, 423 Mass. 436, 444 (1996) (five
fresh complaint witnesses); Commonwealth v. Licata, 412 Mass.
654, 656 n.4, 660 (1992) (two fresh complaint witnesses);
Commonwealth v. Lavalley, [410 Mass. 641], 642 [(1991)] (five
fresh complaint witnesses and videotape of victim's complaint to
police not prejudicial); Commonwealth v. Brouillard, 40 Mass.
App. Ct. 448, 457 n.15 (1996) (four witnesses in case involving
two complainants and two defendants 'not in itself
impermissible').  Contrast Commonwealth v. Swain, 36 Mass. App.
Ct. 433, 442 (1994) (six witnesses prejudicial).  [Under the

present the situation that the court described in Kebreau and many other cases, that is, ongoing abuse of a child victim with many assaults on divers unspecified dates over a period of years, charged in one or two complaints (or indictments).

"The primary goals of the first complaint doctrine were, and still are, to 'refute any false inference that silence is evidence of a lack of credibility on the part of [rape] complainants,' . . . and 'to give the jury as complete a picture as possible of how the accusation of [rape] first arose.'" Aviles, 461 Mass. at 72, quoting from King, 445 Mass. at 243, 247. "[B]y allowing in evidence all the details of the first complaint, the doctrine gives the fact finder 'the maximum amount of information with which to assess the credibility of the . . . complaint evidence as well as the over-all credibility of the victim.'" Aviles, supra, quoting from Commonwealth v. Licata, 412 Mass. 654, 659 (1992). See generally Mass. G. Evid. § 413 (2017). "The fact finder should not be left to speculate on the evidence or to draw erroneous inferences due to incomplete information." Aviles, supra, citing King, supra at 244-245.

---

then existing 'fresh' complaint rule,] [t]here was no error in permitting two fresh complaint witnesses, especially where the testimony of the two was minimally cumulative." King, 445 Mass. at 235-236.

Here, we are satisfied that the judge did not abuse his discretion in admitting the evidence.  See Commonwealth v. Roby, 462 Mass. 398, 410 (2012) ("The testimony furthered the goal of the first complaint doctrine 'to give the jury as complete a picture as possible of how the accusation of sexual assault first arose.'  [King, supra] at 247.  'That complete picture . . . allow[ed] them to make a fairer and more accurate assessment of the validity of that accusation, based on specific information about the people involved rather than on outdated stereotypes and generalities.'  Id.").

b.  Victim's testimony regarding January 1 and July 8 rapes.  For the first time on appeal, the defendant argues that the proper first complaint witness for the July 8 rape was the victim witness advocate with whom the victim spoke, and not the affidavit the victim filed in support of her restraining order application.  In the defendant's view, because the advocate did not testify, the victim should not have been permitted to testify about that conversation -- when she said that she realized for the first time that what had happened to her was wrong.  See King, supra at 245 n.24 ("The [alleged victim] may testify [to the details of the complaint] only if a first complaint witness or a 'substitute' complaint witness . . . is produced at trial who testifies regarding the complaint").

This argument fails.  First, the question which complaint actually was the first complaint was properly addressed at a pretrial hearing.  See Stuckich, 450 Mass. at 455.  At that hearing, the judge determined that the victim's restraining order affidavit filed in the District Court constituted her first complaint about the July 8 rape.  The defendant did not object, and the redacted affidavit was admitted in evidence without objection.[15]  Indeed, when the victim testified about the July 8 rape, she agreed that the affidavit was "the first time that [she] had disclosed in any fashion what had happened on July 8 of 2013."  Because the affidavit was the first disclosure of the July 8 rape, it was admitted properly as first complaint evidence.

Nonetheless, the defendant now claims that the advocate was the proper first complaint witness as to the July 8 rape, as she assisted the victim in filling out the paperwork and actually "induced" the complaint of rape against the defendant.  For this argument, he relies on Commonwealth v. Revells, 78 Mass. App.

---

[15] At the pretrial hearing, defense counsel agreed that a redacted version of the affidavit should be admitted, eliminating any mention of the July 11, 2013, rapes; however, he went on to argue that, in the event the victim provided contradictory testimony that expanded his cross-examination about the July 11 rapes, he would not object to admission of the entire affidavit.  Defense counsel also objected to any subsequent first complaint witness or testimony being admitted, arguing it would be repetitive in nature and that it was the prosecutor's choice to use only the affidavit as the first complaint evidence for the July 8 rape.

Ct. 492, 496 (2010), where the court permitted, but did not require, introduction of intertwined oral and written complaint evidence. Revells does not assist him. In the present case, the victim's conversation with the advocate did not include the complaint at issue, and the victim did not so testify at trial. While the advocate's testimony might very well have been admissible if proffered, there is no reason to suggest it was mandatory in place of the affidavit.

Particularly having in mind that the defendant agreed to the admission of the affidavit, we are satisfied that it was "properly admitted 'to give the jury as complete a picture as possible of how the accusation of sexual assault first arose.'" Ibid., quoting from King, 445 Mass. at 247. As the defendant did not object at any time to the admission of the affidavit -- or to testimony about the circumstances under which that statement was made -- the argument that it should not have been admitted is waived. We see no error and certainly no substantial risk of a miscarriage of justice. See Roby, 462 Mass. at 409-410.

In addition, also for the first time, the defendant now contends that the victim should not have been permitted to testify that she told Detective Benedetti about the January 1 rape, because there was no corresponding first complaint

testimony.  As noted, the defendant did not object to that testimony during the trial.

Even if, in the absence of a corroborating first complaint witness, the victim should not have been permitted to testify that she made a complaint, we see no substantial risk of a miscarriage of justice.  The victim's extremely brief testimony about when she disclosed the January 1 rape was contradicted both by the detective and, on cross-examination, by her own admission that she was not sure when she had disclosed that incident.  That contradiction likely inured to the defendant's benefit and he exploited it forcefully, as he did all of the first complaint evidence.[16]  Under these circumstances, it is unlikely that the statement affected the defendant adversely at all.  See Commonwealth v. McCoy, 456 Mass. 838, 851 (2010) ("Where the inconsistencies contained in the cumulative first complaint testimony were more important to the defense than the Commonwealth, there is no harm to the defendant.  See

---

[16] For example, in his closing argument, counsel said, "[The victim's] story was never one that stayed the same.  It changed from telling to telling.  It evolved and it became greater and it added more details and it added other incidents as time went on.  It was never a consistent whole form. . . .  Though she testified on the stand, 'I didn't know even what he did was rape,' which is her attempt at explaining why, when the police come there, why they're separated, the police are in her apartment, her alone, allowing her to describe what is the problem.  She never tells them that she was sexually assaulted.  She never mentioned that until later.  Then the story grew and grew and grew.  That's why we're here today."

Commonwealth v. Nardi, 452 Mass. 379, 395-396 [2008] [where testimony erroneously admitted was equally, if not more, important to defense, admission did not create substantial likelihood of miscarriage of justice]"). See also Roby, 462 Mass. at 409 ("We add, in considering whether the admission of the testimony created a substantial risk of a miscarriage of justice, . . . that the testimony was brief and provided no details of the alleged sexual encounter[]"). In addition, as it relates to first complaint testimony, some inconsistency "is expected, and will often aid the jury in determining whether the [first] complaint testimony ultimately supports the complainant's story." King, 445 Mass. at 235. "The weight and credibility of the witnesses' testimony are solely for the fact finder and are not proper subjects for appeal." Ibid.

c. Limiting instructions. Although the defendant did not object at trial, he now claims that the judge erred, on two occasions: (1) by not giving a limiting instruction on the use of first complaint testimony at the time the victim testified that she told Detective Benedetti about the January 1 rape, and (2) by providing an incomplete instruction when Detective Benedetti testified. We review his claim of error to determine whether any omission created a substantial risk of a miscarriage of justice. See Aviles, 461 Mass. at 72, citing McCoy, 456 Mass. at 850-852.

King, supra at 248, teaches that limiting "instructions should be given to the jury contemporaneously with the first complaint testimony, and again during the final instructions." However, "although a contemporaneous [first] complaint instruction is recommended, it is 'not a strict requirement.'" Commonwealth v. Edward, 75 Mass. App. Ct. 162, 166 (2009), abrogated on other grounds by Commonwealth v. Lavoie, 464 Mass. 83, 88-89 (2013), quoting from Commonwealth v. Vieux, 41 Mass. App. Ct. 526, 533 (1996), cert. denied, 520 U.S. 1245 (1997).

Here, before the victim testified about the July 11 rapes, the judge gave a thorough limiting instruction about the use of first complaint testimony. The defendant did not object. The victim then testified briefly that, on July 11, 2013, she had told Detective Benedetti about the circumstances of the rapes that had occurred earlier that day. Immediately afterward, in answer to the prosecutor's question, she said that she also had told Benedetti about the January 1 rape. The argument that the judge, minutes after giving a complete instruction (occupying three pages of the transcript), should have repeated that same instruction after two more questions is simply frivolous.

As to the defendant's second argument, prior to Benedetti's testimony, the judge gave an abbreviated first complaint instruction, referring to the "rather complicated" instruction he had given the previous day. Again, while reciting the entire

model instruction might have been preferable, because the limiting instruction was given contemporaneously with the detective's testimony, and referred to the full instruction given the day before, it was sufficient, particularly in light of the judge's thorough instruction in the final charge to the jury the following day.

As we have said, in each instance, the instructions were given without any objection. Nor did the defendant object to the first complaint instruction in the final charge to the jury; he does not challenge it here. We presume that the jury followed the judge's proper instructions in assessing the first complaint testimony. See Commonwealth v. Andrade, 468 Mass. 543, 549 (2014).

Conclusion. We are satisfied that the trial judge did not abuse his discretion in admitting the challenged first complaint evidence, and that proper instructions were provided timely to the jury. The judgments are affirmed.

So ordered.